**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**William H. ADDINGTON,**
**Defendant-Appellant.**

**No. 71–1073.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Sept. 13, 1971.

Decided Jan. 8, 1973.

Robert D. Hecht, of Scott, Quinlan & Hecht, Topeka, Kan., for appellant.

E. Edward Johnson, Asst. U. S. Atty., Topeka, Kan. (Robert J. Roth, U. S. Atty., District of Kansas, Topeka, Kan., on brief), for appellee.

Before PHILLIPS, HOLLOWAY and McWILLIAMS, Circuit Judges.

HOLLOWAY, Circuit Judge.

Appellant William H. Addington was found guilty on 14 counts of an indictment charging various criminal acts in connection with the handling of grain belonging to Commodity Credit Corporation (CCC). Seven counts alleged conversion of Government grain (15 U.S.C. A. 714m(c)). In 4 counts he was alleged to have made false statements to a Government agency concerning quantities of grain in storage (15 U.S.C.A. 714m(a)). The remaining counts charge the making of false claims to the Government for storage charges (18 U. S.C.A. § 287). Each count also alleged that Addington aided and abetted the commission of the offenses (18 U.S.C.A. § 2). Addington appeals his conviction and the five-year concurrent sentences imposed on all counts. On appeal he argues five propositions:

(1) that the evidence was insufficient to support the convictions;

(2) that this prosecution was barred by collateral estoppel, former jeopardy and res judicata, and that he was entitled in presenting this defense to a transcript of an earlier trial resulting in an acquittal on similar charges;

(3) that it was error to deny his motion to quash the indictment and the warrant for lack of establishment of probable cause;

(4) that the trial court erred in denying him a transcript of the grand jury proceedings; and

(5) that the court erred in refusing to permit his attorney to voir dire the prospective jurors.

We conclude that no ground for reversal is shown and affirm.

### 1. *Sufficiency of the evidence*

First we will address the issue of the sufficiency of the evidence since this discussion will present the essential factual circumstances. In focusing on this issue we note that it is not argued that there was insufficient proof on which the jury could have concluded that the invoices were false and that there were shortages of grain at the Hutchinson, Kansas, elevator which is involved. Instead the attack seriously questions

whether Addington had the requisite guilty knowledge in connection with the shortages and the conversions charged and whether he knowingly was involved in making the related statements and claims alleged to be false.[1]

In determining whether the evidence is sufficient to support a jury verdict of guilty we must view the proof in the light most favorable to the Government to ascertain if there is sufficient substantial evidence, direct and circumstantial, together with the reasonable inferences therefrom, from which the jury might find the defendant guilty beyond a reasonable doubt. United States v. Butler, 446 F.2d 975 (10th Cir.). So viewing the record, the proof favorable to the Government tended to show the following facts.

Addington was a resident of Wichita, Kansas, at the time of trial. He had for several years owned extensive business interests. He was the sole stockholder of Addington Grain Company, Inc. (Addington, Inc.), which owned and operated a grain elevator at Hutchinson. This case arises from transactions involving that elevator.

In addition Addington operated elevators in Elkhart, Kansas, and Tucumcari, New Mexico, as the sole proprietor of an unincorporated business, Addington Grain Company. He also owned a ranch and motel in Nevada, operated another ranch in Wyoming which he leased, and had interests in two laundry and dry cleaning businesses in Wichita.

Addington formed a partnership with Robert Taggart and two other gentlemen by the name of Blosser, known as the AB&T Grain Company (AB&T). This partnership was formed to engage in the grain storage business and a grain elevator and office at Topeka belonged to it. In about October of 1959 William F. Allison was employed to manage this operation. At about that time it was also agreed that AB&T, through Allison, would also manage Addington, Inc., which paid a fee to AB&T for this management service. Both the Addington, Inc., elevator at Hutchinson and the AB&T elevator at Topeka began to receive grain for storage in late 1959 or early 1960. Both companies later began engaging in cash grain transactions.

Allison maintained an office in Topeka with a staff of two or three assistants to carry out these management functions. The office personnel were actually listed as employees of AB&T and were carried on its payroll, although they also spent considerable time on Addington, Inc., business. During this time Addington also maintained an office in Wichita, staffed mainly by an accountant and a secretary. The books and records of cash flow for all of Addington's business interests were maintained at this Wichita office, except for the business interest of Addington in AB&T and the Nevada motel.

Within about eight months to a year after the commencement of the AB&T operations in late 1959, Addington sold his interests in that venture to his other partners. However, Allison continued with the AB&T arrangement to manage the Hutchinson elevator operations. Although AB&T discharged Allison in the spring of 1965, he continued as manager

---

1. Addington's brief specifies the attack on the Government proof by questioning whether it sufficiently established the following points:

"1. That at material times, the Defendant knew of the shortages.

"2. That at material times the Defendant, with the knowledge of the staff, made or caused to be made, claims to Commodity Credit Corporation for the purpose of attempting to obtain funds to which he knew he was not entitled..

"3. That the Defendant knowingly made false statements to Commodity Credit Corporation, in writing, with the intent to defraud.

"4. That the Defendant knew, authorized or aided in the conversion of grain belonging to Commodity Credit Corporation.

"5. That the Defendant did any act with guilty knowledge or fraudulent intent."

of the Hutchinson grain elevator of Addington, Inc., until around October, 1965.

During the years of its operation the Hutchinson elevator was used extensively for storage of CCC grain. Periodically Addington, Inc., was required to submit invoices to the Government certifying the amount of CCC grain stored in the Hutchinson elevator. The invoice forms were furnished by the Government, stating the amount of CCC grain which the elevator was supposed to contain. After submission of each invoice, payment of warehouse storage charges based on the amount of grain stored was made by the Government to Addington, Inc., or its assignee. Eventually CCC removed all of its wheat out of the Hutchinson elevator. However, when the last car was shipped out in May, 1966, the Government records showed a shortage of 410,000 bushels of wheat.

The offenses charged were alleged to have occurred between about December 18, 1964, and July 1, 1965. The theory of the Government's case was that through this period there was insufficient grain stored at the Hutchinson elevator to cover the amount placed there by CCC; that the periodic invoices certified to the Government were false; that they constituted a false statement thereon and a false claim to the Government; and that in view of the deficit position of the grain stored at the Hutchinson elevator, the sales of Addington, Inc., constituted conversion of Government grain.

By detailed testimony of accountants, employees of various companies, railroad employees and state and federal inspectors the Government sought to account for each sale, purchase and shipment of grain to or from the Hutchinson elevator. As stated earlier, Addington does not contend that the proof was lacking to show that there were shortages and therefore inaccurate invoices for the grain stored at Hutchinson. Addington's contention was that Allison knowingly carried on the unlawful transactions and made the false invoices, but this was all without the knowledge of Addington.

Allison was originally a co-defendant charged in the indictment with Addington. However, prior to trial he pleaded guilty to 6 counts and was not prosecuted at the trial with Addington on the remaining counts.[2] At trial Allison testified for the Government.

Allison stated that at all times, and specifically from December, 1964, through June, 1965, he advised Addington of the grain shortages; that he was instructed by Addington to sell grain during this time; and that he was told by Addington to issue warehouse receipts on grain even though the elevator was in a short position.

Allison said he had pleaded guilty to one conversion count in the indictment because he had sold grain at one time when he knew that the elevator was in short position but that he had done so at Addington's instance. He said he never made an independent decision to sell grain at a time when the house was in a short position. He said also that it was common practice not to post load-out sheets on time, and that this was in order to keep the books from reflecting the grain shortages. He was instructed to do so by Addington.

Allison said he met with Addington in January of 1965 and discussed the fact that the books showed an extra 276,584.-50 bushels of company-owned grain backed up through false entries. Allison also identified numerous memos sent to Addington and his accountant at Wichita in 1963 advising of the inventory position of the elevator, some of which reflected that the house was in a short position by over 200,000 bushels. Letters were identified that Allison said he sent Addington from 1961 through 1963, advising of shortages at the elevator, and a letter from Addington instructing him to ship out grain.

---

2. The record does not show the disposition of these additional counts against Allison.

Allison identified a letter of resignation submitted in February, 1965, but it was shown that his work on the Hutchinson operation did not entirely stop until October, 1965. He testified that after this letter the decisions to negotiate on grain transactions were made by Addington. He said also that an "advice" stating the amount of each CCC periodic invoice was mailed to Addington's Wichita office as well as Allison's office in Topeka. The "advice" was a notice from the Denver United States National Bank, which had been assigned proceeds of storage charges due Addington, Inc., in May, 1963. Allison said that Addington was notified of each quarterly invoice received from the CCC, although the invoices were not sent to Wichita. These were the invoices showing the amount that would be due to Addington, Inc., when signed and returned to the Government. Allison testified that Addington was told the amounts that were going to be due, and he said Addington was aware that unearned warehouse charges were being received.

There was a substantial attack by cross-examination and defense testimony on Allison's credibility. Addington sought to create a cloud about Allison's personal financial transactions and his integrity. Addington attempted to show that Allison took grain from Addington, Inc., to cover shortages in other enterprises he was managing. However, Allison did not withdraw in substance the testimony adverse to Addington that has been detailed. Allison denied that the shortages resulted from grain or money being stolen from the company by him and testified that he knew of no such actions by others.

There was substantial testimony by additional witnesses bearing on the knowledge and participation by Addington in the grain transactions. Two sales were shown to have been made with Addington's personal knowledge, which were the subject of conversion counts.[3] Moreover, there was proof that Addington signed one invoice that premised two counts, one a false statement and the other a false claim. His secretary in the Wichita office, Mrs. Dobbins, testified she had maintained a "daily position" grain book on the Hutchinson elevator during her employment from 1963 until the close of operations in 1966. She said that the book was kept up to date at all times. On occasions there were "measure-ups" by state grain inspectors showing more grain in storage than appeared on the books. Mrs. Dobbins said she was instructed by Allison to make "plugged" entries showing the excess as company-owned grain. By December 31, 1964, however, the daily position book showed company-owned grain in a minus position of 162,498 bushels. From December, 1964, through June 28, 1965, the company-owned grain was never shown to be in a plus position.

Mrs. Dobbins said the journal was kept for Addington's use and that on several occasions she conferred with him regarding the position of the Hutchinson elevator as reflected by it. She said she had indicated to Addington that she was concerned about the shortage of grain at the Hutchinson facility and he told her not to worry about it. Addington was at the Wichita office infrequently but was often in touch with the office by phone. She said he was aware of the situation shown in the journal through the period of time involved. And she said she had heard Addington instruct Allison to sell grain on numerous occasions, usually specifying dollar amounts for sales rather than numbers of bushels. The office manager and accountant at Wichita during the indictment period, Mr. Fraizer, also said that on occasions he had discussed with Addington the information shown on the daily position sheets kept by Mrs. Dobbins.

---

3. One of these transactions was a sale of 100,000 bushels of wheat to Cargill, Inc., in May, 1965. Another was a sale to Continental Grain Co., in May and June, 1965, which was discussed by telephone with Addington.

Addington denied implication in any of the wrongful transactions, saying that he did not have knowledge of what was going on. In substance his testimony was that he relied on his employees to carry on the business and submit the statements and claims involved. He said he was gone much of the time and referred to his extensive business interests elsewhere. His considerable absences and his large business interests, in and out of Kansas, were proved without dispute. He pointed to an asthmatic condition that made it inadvisable for him to be around the elevators.

Addington also testified that he did not believe the grain records were accurately maintained, particularly in view of the large purchases of grain that Addington, Inc., had made. He also said he had relied on audits by Arthur Young and Company and Western Weighing Company and state grain inspectors' reports which had shown that he was in balance or in a long position on grain. Other witnesses, some for the Government, gave testimony supporting Addington on the accounting report, saying that the auditors for Arthur Young and Company did not report any shortages in grain to them.

██ The extensive trial record contains much conflicting evidence from the witnesses and documentary exhibits. A vigorous and substantial defense was offered on behalf of Addington. Allison and other Government witnesses were subjected to severe and sometimes damaging cross-examination. Nevertheless the weighing of the conflicting testimony and judging the credibility of the witnesses were for the jury. United States v. Plemons, 455 F.2d 243, 246 (10th Cir.). Viewing the proof in the light most favorable to the Government, as this court must after the jury verdict of guilty, we are satisfied that the evi-

dence was sufficient to support the charges of aiding and abetting. There is ample record evidence tending to show that Addington did associate himself with the wrongful venture; that he participated in it as something he wished to bring about; and that he sought by his actions to make it succeed. Nye & Nissen v. United States, 336 U.S. 613, 619–620, 69 S.Ct. 766, 93 L.Ed. 919. We conclude that the convictions are sustained by the record.

2. *Collateral estoppel, res judicata and double jeopardy*

Counsel for Addington argues vigorously that this prosecution was barred by reason of previous criminal prosecutions of the defendant in the state and federal courts. Much reliance is placed on Ashe v. Swenson, 397 U.S. 436, 90 S. Ct. 1189, 25 L.Ed.2d 469; and Sealfon v. United States, 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180. Error is also asserted based on the trial court's rejection of Addington's request for a trial transcript of the earlier federal prosecution on similar charges against him involving the Elkhart elevator; this prosecution had resulted in an acquittal and is the basis for the principal argument on the defenses. The request for this transcript was made in the light of the trial court's determination that Addington was an indigent and unable to provide for his own defense.

██ First Addington argues that prior prosecutions in the Kansas courts bar the instant prosecution by reason of principles of double jeopardy.[4] Those prosecutions by the separate sovereignty, however, furnish no ground for an assertion of the defense of double jeopardy. Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729; see also Waller v. Florida, 397 U.S. 387, 392–394, 90 S.Ct. 1184, 25 L.Ed.2d 435.

4. We are advised by Addington's brief that charges on which he was convicted by the Kansas courts were for use of false warehouse receipts and related charges, and that the proof concerned the Addington, Inc., elevator at Hutchinson as well as the Addington Grain Co., elevator at Elkhart. For an appeal of a conviction of one of such state charges see State v. Addington, 205 Kan. 640, 472 P.2d 225.

Addington's principal argument is that this prosecution was barred by a determination favorable to him on the issue of guilty knowledge in the earlier criminal prosecution brought by the Government involving the Elkhart elevator. He argues that this follows logically from the principles of Ashe v. Swenson, supra, and Sealfon v. United States, supra, which applied collateral estoppel in criminal proceedings and he says this prosecution wrongly required him to "run the gantlet" a second time. Green v. United States, 355 U.S. 184, 190, 78 S.Ct. 221, 2 L.Ed.2d 199. In *Ashe* the Supreme Court gave effect to the operation of collateral estoppel on an examination of the record with realism and rationality as to the issues determined. Ashe v. Swenson, supra 397 U.S. at 444, 90 S.Ct. 1189. See Bell v. Kansas, 452 F.2d 783 (10th Cir.), cert. denied, 406 U.S. 974, 92 S.Ct. 2421, 32 L.Ed.2d 674. On examining the record in this realistic way, if the issue of guilty knowledge as to the transactions involved here was actually determined in the prior prosecution, a collateral estoppel defense would be available under the *Ashe* and *Sealfon* cases.

Addington argues that his defense in the Elkhart case was lack of guilty knowledge, as it was here, and that some eleven witnesses for the Government were the same in both cases, with much proof being offered concerning the Hutchinson operation in the Elkhart case. From these circumstances he says the not guilty verdict in the Elkhart case necessarily determined that the Government failed to prove guilty knowledge or intent and that this finding concludes the issue of guilty knowl-

edge here. He points out that extensive evidence of the operations of Addington, Inc., and the Hutchinson elevator was offered in the Elkhart case to show guilty knowledge, intent and a common scheme and design, and that such proof was admitted for these purposes. Addington says that this proof offered in the earlier case, where he was acquitted, was substantially re-introduced in our case.[5]

Viewing the record with the approach of realism and rationality that is required, we are not persuaded that the collateral estoppel defense is available. The periods of time of the offenses alleged were different, there being no overlap.[6] Moreover the prior charges and resulting acquittal relied on for this defense concerned only the Elkhart elevator owned by Addington Grain Co., and did not involve Addington, Inc., or its Hutchinson elevator. In such circumstances it may not be concluded that the issue of ultimate fact of guilty knowledge involved in our case was determined favorably to Addington by the prior acquittal. Since it is clear that different times and transactions were involved, a rational jury could have grounded its verdict on an issue other than that which the defendant seeks to foreclose from consideration, and thus collateral estoppel would not apply. Ashe v. Swenson, supra, 397 U.S. at 444, 90 S.Ct. 1189. In fact the issue of guilty knowledge as to the transactions involved in our case was not actually before the prior jury for determination, despite admission of proof about the Hutchinson elevator operations for the purposes stated.

---

5. We have noted Wingate v. Wainwright, 464 F.2d 209 (5th Cir.), cited by counsel for Addington, but feel it inapposite. There is no claim here that the Government used against Addington evidence of prior criminal acts which the jury in the Elkhart case concluded that he did not commit. Moreover we have stated the view that the fact of acquittal or conviction of the similar offenses sought to be proved is to be seriously weighed in de-

termining whether to admit such evidence, but that it is not decisive. See United States v. Burkhart, 458 F.2d 201, 208 (10th Cir.).

6. In the Elkhart case the acts charged were alleged to have occurred in October and November of 1965. The present prosecution involves acts occurring from about December 18, 1964, through about July 1, 1965.

■ What we have said also disposes of the claim of error in the denial of the transcript of the Elkhart trial. Addington points out that the proper realistic approach to collateral estoppel was said to require examination of the record of the prior proceeding, taking into account the pleadings, evidence, charge and other relevant matter. Ashe v. Swenson, supra, 397 U.S. at 444, 90 S.Ct. 1189. However, since our record and Addington's brief show that different times and separate operations were involved in the Elkhart case and our case, the prior record would not furnish a basis for the defenses which are urged.[7] We are convinced from consideration of the claims made by Addington and our present record that there was no prejudicial error in the trial court's denial of the request for the transcript of the Elkhart case.

It is also urged that we adopt the theory that where the same transaction or criminal episode is involved and the defendant has been subjected to a prior prosecution therefor, the defense of double jeopardy is available against a subsequent prosecution for another offense committed during the episode. See Ashe v. Swenson, supra, 397 U.S. at 448–460, 90 S.Ct. 1189 (Brennan, J., concurring); State v. Brown, 497 P.2d 1191 (Or.). While we have already indicated disapproval of the theory, see United States v. Birch, 451 F.2d 165, 167 (10th Cir.), we feel it should not apply here in any event. The charges in the Elkhart case and this case might have been joined as being of the same or similar character or as based on transactions connected together or constituting part of a common scheme, which is a consideration mentioned by the concurring opinion of Mr. Justice Brennan. 397 U.S. at 454–455, 90 S.Ct. 1189. Nevertheless, for the reasons stated previously, we believe the offenses charged here should not be treated as part of the same criminal episode or transaction as those in the Elkhart case.

### 3. *The validity of the indictment and the arrest warrant*

Addington asserts error in the trial court's denial of his motion to quash the indictment and the arrest warrant. His pretrial motion in this regard asserted that the indictment, and hence the warrant, were not based on a showing of probable cause; that the grand jury was not given a copy of the applicable statutes to consider; and that the grand jury was not given instructions of law on the elements of the offenses and other important legal points. In addition, at the hearing on the motion counsel for Addington made an offer of proof to support these contentions. The trial court rejected the offer and denied the motion, expressing the view that the court should not permit an inquiry into the functioning of the grand jury and that it could only consider a challenge to the validity and composition of the grand jury itself.

■ We are satisfied that the contentions and the offer of proof in support of them raise no matters that could justify quashing the indictment or the warrant. There is no challenge that the grand jury itself was not legally constituted and unbiased. Instead, the challenge is that there was no evidence showing probable cause and that the various procedures were not legally sufficient, as stated. However, an indictment returned by a legally constituted and unbiased grand jury, valid on its face, is sufficient to call for trial of the charge on the merits. Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397. Applying *Costello*, we decline to permit a defendant to challenge the indictment on the ground that it was not supported by adequate or competent evidence. See United States v. Birmingham, 454 F.2d 706, 710 (10th Cir.), cert. denied, sub nom. Chiles v. United States, 406 U.S. 969, 92 S.Ct. 2424, 32 L.Ed.2d 668. And the indictment itself furnished an adequate basis

---

7. Our record has been supplemented with the indictment and the charge from the Elkhart case.

for the issuance of the warrant. See Giordenello v. United States, 357 U.S. 480, 487, 78 S.Ct. 1245, 2 L.Ed.2d 1503.

### 4. *The transcript of the grand jury proceedings*

Relying on Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973, and similar cases, Addington claims error in the denial of a transcript of the grand jury proceedings. No specification is made as to particular testimony that was needed which was not furnished, nor is any particular information from the grand jury transcript shown to have been necessary for the defense. Rather, only a general claim is made that the transcript was needed for the defense and that the defendant should be held entitled to a transcript as a matter of right. Addington urges that we adopt a new rule entitling a defendant to the recording of grand jury proceedings and the furnishing of a transcript of them on request, unless protection of the national security or the secrecy of pending investigations should be held to prevent such disclosure.

Considerable stress is placed on a claim that the Government misinformed the court about the existence of transcripts. The argument is that the Government had denied that the grand jury testimony of trial witnesses in the instant case had been transcribed when as a matter of fact such testimony was transcribed preceding the related prosecution concerning the Elkhart elevator. And Addington says that there was "common grand jury exposure," closely tying together the two proceedings. As a matter of fact the Government advised the court that it did have transcripts of some grand jury testimony of two witnesses who testified in the instant case, and this was made available to the defense before trial.[8] We are

satisfied that the record does not support the claim that the court was misinformed by the Government and there is no showing of any prejudice to the defense in this regard.

The broad claim for furnishing of the grand jury transcript was untenable. It is clear that there is no right to grand jury testimony of witnesses not called on to testify at trial. United States v. Parker, 469 F.2d 884 (10th Cir. 1972); Cargill v. United States, 381 F.2d 849, 852 (10th Cir.). Moreover there is no requirement that the grand jury proceedings be recorded for furnishing to the defense. United States v. Cooper, 464 F.2d 648, 653 (10th Cir.); United States v. Goad, 426 F.2d 86, 88 (10th Cir.); MacCaffery v. United States, 372 F.2d 482, 484 (10th Cir.), cert. denied, 387 U.S. 945, 87 S.Ct. 2078, 18 L.Ed.2d 1332. Thus the contentions relating to the grand jury transcripts are without merit under our present decisions and we decline to adopt the views that are urged.

### 5. *Voir dire of the jury*

Addington says that the trial court erred by refusing to permit his counsel to voir dire the prospective jurors himself, and that he was thereby denied the effective assistance of counsel. He argues that the court merely gave a narrative statement to the prospective jurors and elicited general affirmative or negative answers to qualify them, denying the opportunity for a proper voir dire.

Rule 24(a), Fed.R.Crim.P., gives the trial court discretion as to whether to permit voir dire examination of prospective jurors by counsel or to conduct the examination itself. United States v. Mattin, 419 F.2d 1086 (8th Cir.); see also Brundage v. United States, 365 F.2d 616 (10th Cir.). Here the trial court

---

8. Government counsel advised the trial court that no court reporter took the grand jury proceeding relating to the instant case. However, transcripts were furnished before trial of certain grand jury testimony of two witnesses who tes-

tified at the trial of this case. These transcripts apparently were made from the grand jury proceedings in connection with the related cases involving the Elkhart elevator and a prosecution of Allison involving the A B & T operations.

denied the request by defense counsel that he be permitted to question the prospective jurors directly and the court instead chose to conduct the examination, in accordance with the customary practice in this Circuit. See Brundage v. United States, supra at 618.

The record shows that defense counsel was permitted to submit questions for the prospective jurors to the court, and we feel there was no abuse of discretion in the questioning as conducted. Furthermore defense counsel advised the court on several occasions that he had no further questions to submit on the matters being covered. Addington points to no specific inquiry that should have been made and was omitted and thus shows no prejudice. See United States v. Williams, 417 F.2d 630 (10th Cir.). We believe that the voir dire examination revealed by the record in no way denied the "essential demands of fairness," United States v. Williams, supra at 631, and did not deprive Addington of the effective assistance of counsel. We are satisfied that no reversible error is shown in these respects.

The record reveals a fair trial and no reversible error is demonstrated. Accordingly, the judgment is affirmed.