Charles E. OLIPHANT,
Petitioner-Appellant,

v.

Theodore KOEHLER, Warden, Marquette
House of Corrections and Branch
Prison, Respondent-Appellee.

No. 78–1345.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 8, 1978.

Decided March 6, 1979.

Rehearing and Rehearing En Banc
Denied May 4, 1979.

Terance R. Flanagan, Asst. State App. Defender, Detroit, Mich., for petitioner-appellant.

Charles Edward Oliphant, Jr., pro se.

Frank J. Kelley, Atty. Gen. of Michigan, Robert A. Derengoski, Sol. Gen., Thomas L. Casey, Asst. Atty. Gen., Lansing, Mich., for respondent-appellee.

Before EDWARDS,* Chief Judge, WEICK, Circuit Judge, and CECIL, Senior Circuit Judge.

WEICK, Circuit Judge.

The petitioner Oliphant has appealed from a judgment of the District Court denying his application for a writ of habeas corpus. The District Court's opinion denying the writ is reported in *Oliphant v. Koehler*, 451 F.Supp. 1305 (W.D.Mich.1978). Oliphant had been convicted by a jury, in the Circuit Court of Ingham County, Michigan on charges of forcible rape, in violation of M.C.L.A. § 750.520; M.S.A. § 28.788, and gross indecency, in violation of M.C.L.A.

_____

* Judge Edwards became Chief Judge on January 15, 1979.

§ 750.338b; M.S.A. § 28.570(2) of an eighteen year old white girl who was a freshman at Michigan State University. His conviction followed a second trial on the above charges. He was sentenced on June 2, 1972 to a term of four to five years' imprisonment on the gross indecency conviction and twenty to thirty years' imprisonment on the rape conviction. He served his sentence on the gross indecency conviction and was discharged on February 19, 1975 and is now serving the unexpired sentence on his rape conviction. His first trial resulted in a mistrial when the jury was unable to reach a verdict. His conviction was affirmed by the Michigan Court of Appeals in *People v. Oliphant*, 52 Mich.App. 242, 217 N.W.2d 141 (1974), and by the Supreme Court of Michigan in *People v. Oliphant*, 399 Mich. 472, 250 N.W.2d 443 (1976).

In his appeal from the denial of the writ of habeas corpus, Oliphant contends that in his trial, the admission of certain evidence under Michigan's "similar acts" statute put him in double jeopardy for the "same" offense and was barred by collateral estoppel, citing *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

Oliphant also asserts an essentially frivolous claim that there was invidious discrimination against him in the exclusion of eighteen to twenty-one year old persons from the Michigan petit jury array. He never raised this question until after the commencement of his second trial.

We affirm. In our opinion, in his conviction for rape there was no double jeopardy or any violation of the doctrine of collateral estoppel. His rape of complainant involved a different person than the young women complaining in the similar acts shown. We are also of the opinion that Oliphant was too late in his challenge to the petit jury array and that he waived it under the rule announced in *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976).

I

The trial in this case took several days. The testimony of the complainant was to the effect that on June 1, 1971, she had dinner with her grandparents and on her way back to the campus during the early evening hours she was window shopping when Oliphant, a black man, approached her indicating that he desired to talk to her about his racial problems. The two engaged in a friendly conversation. Complainant had never met Oliphant before. At Oliphant's invitation she accompanied him to a nearby bar to discuss his "problem." They each had a glass of beer. The two discussed race relations and Oliphant complained of having suffered racial discrimination in complainant's hometown. She sympathized with him. The subject of marijuana was also discussed. Thereafter, at his invitation, complainant agreed to accompany Oliphant in his car to a place where they might find a band and dance. Upon entering Oliphant's two-door Ford Mustang, complainant discovered that the door handle was missing from the inside of the passenger's side door. Once inside the car she could open this door only by rolling down the window and using the outside door latch.

Oliphant drove complainant to one bar which was closed, to a second where she was denied admission because of her age, and finally to a third which did not have a band. Oliphant also stopped at several gas stations and a car wash. Complainant testified that as the evening wore on, she indicated more than once her desire to return to her dormitory. She stated that Oliphant's demeanor remained friendly until after they left the third bar when his friendly attitude drastically changed. At that point he began driving through a part of the city which was unfamiliar to her. Oliphant then asked complainant if he could "screw" her. After she said "no" and also declined to engage in oral sex with him, Oliphant began driving away from the campus and ordered her not to "go for the door." Oliphant then told complainant to sit on the center console, so that they would appear as boyfriend and girlfriend. She testified that he threatened that he had a knife or a gun

and would "take care" of her if she did not follow his wishes and he would also injure her parents and sisters. Oliphant then parked the car in a secluded area. By means of further threats he ordered complainant to remove her underclothing, and she complied. Oliphant then engaged in oral sex with his penis in her mouth which made her sick. He then had intercourse with her, lacerating her hymen and causing her excruciating pain and to bleed profusely.

At no time was she beaten or were her clothes torn. No weapon was exhibited. Following the intercourse, complainant replaced her clothing and was driven directly back to her dormitory. Oliphant advised her not to endeavor to prosecute him for rape, stating that she could not prove rape. He further stated that he had a tape recorder in the car although none was ever found. He asked her to sign an agreement not to prosecute, but could not find a pencil. Oliphant also told complainant that he was married and had children. As she was getting out of Oliphant's car, he told her to be sure to get the license plate number of his car. Complainant then returned to her dormitory crying and telling her girl friend that she had been raped. The campus police were called. She was taken to the Olin Health Center of Michigan State University where she was examined by the Center's attending physician. The doctor testified at trial that she had a laceration in her hymen three-quarters of an inch in length; that there was blood in her vagina which he absorbed with sponges and sutured her hymen with two stitches; that by bringing the edges of the hymen together he was able to approximate its original size; it could barely have admitted a finger and was thick; that she had been a virgin; that the laceration, in his opinion, had occurred about an hour before he examined her. The physician also found semen in her vagina. Oliphant, and not his attorney, cross examined the doctor.

After Oliphant dropped complainant off, he proceeded to the East Lansing Police Department. He told officers that he had engaged in sex with a girl that evening. Oliphant stated that when he complained of her body odor she became angry with him. Her alleged body odor, however, did not seem to deter Oliphant from committing the atrocities on her body. He indicated to the police that he feared she might charge him with rape. Shortly thereafter a report of her complaint of rape came in to the police and Oliphant was arrested.

Testifying in his own behalf,[1] Oliphant admitted that he engaged in acts of fellatio and sexual intercourse with complainant. He claimed, however, that all of these acts were consensual. He also admitted that he was married and had two children. Oliphant's testimony largely corroborated that of complainant regarding the street encounter and initial discussion in the nearby bar. He further corroborated her version of the travels to the three bars, except that he denied that complainant ever insisted on returning to her dormitory. Oliphant also agreed that when he first indicated his desire for sex, complainant refused. Their testimony diverged when Oliphant drove to an unfamiliar section of the city. He testified that she agreed to engage in oral sex, and later intercourse. Finally, Oliphant testified that complainant became angry only when he complained to her about her unpleasant body odor. Oliphant denied that he attempted to orchestrate the events and circumstances of the evening in order to make proof of the alleged rape more difficult. Ordinarily a rapist is not cunning enough to devise such an elaborate scheme as was adopted by Oliphant to escape conviction, and he nearly succeeded as is evidenced by the result of the first trial.

1. Oliphant participated extensively in his own defense. He made the opening statement to the jury. He objected to evidence and made arguments to the court. He cross examined several witnesses. He permitted his counsel, however, to cross examine the complainant.

Oliphant probably did not know of the old adage that one who acts as his own lawyer has a fool for a client. His performance in front of the jury might have caused them to react against him. If so, he would have no one to blame but himself.

In rebuttal, and in an effort to prove that Oliphant carried out such a planned orchestration of events, the people proposed to call three additional witnesses. Testimony was offered pursuant to Michigan's similar acts statute, which read as follows:

In any criminal case where the defendant's motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing the act, in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto; notwithstanding that such proof may show or tend to show the commission of another or prior or subsequent crime by the defendant. [M.C.L.A. § 768.27; M.S.A. § 28.1050]

Two of the rebuttal witnesses had been complainants in two prior rape trials involving Oliphant. In both prior trials he had been acquitted. The testimony of these two women is the basis of Oliphant's double jeopardy and collateral estoppel claim.[2]

Before the testimony of the two women was offered the trial judge conducted a hearing in the absence of the jury where the matter was carefully considered and resolved, particularly that its probative value was not substantially outweighed by the potentially unfair prejudicial effect. Immediately prior to the introduction of any of the rebuttal testimony the trial judge advised the jurors of the limited purpose for which the testimony was offered and for which it could be used. The court also advised the jurors of Oliphant's acquittal both before and after the testimony of rebuttal witnesses. In his final instructions to the jury, the trial judge restated the limited purpose for which such evidence could be considered. This point was also made by the prosecutor in his closing argument.

The Supreme Court of Michigan had previously upheld the validity of Michigan's similar acts statute in *People v. Kelly*, 386 Mich. 330, 334, 192 N.W.2d 494, 498 (1971) and cases cited therein.

In *People v. Oliphant, supra*, 399 Mich. at 483, 250 N.W.2d at 446, the Court stated:

Defendant challenges the applicability of the statute in his case where the only contested issue is consent. The people contend that the defendant had a sophisticated scheme, plan or system whereby, should his advances meet resistance, he would commit rape while orchestrating the circumstances so as to preclude his victims from proving their nonconsent.

The Court then summarized the testimony of the three rebuttal witnesses as follows:

First, we must determine whether the acts of rape testified to reveal a plan or scheme to arrange the circumstances surrounding the episodes in such a way as to make it appear that the victim consented. A brief summary of the testimony of the three witnesses follows:

Witness "A" testified that on the morning of December 24, 1970, she was walking to work. When approximately one mile from her destination, defendant stopped his car and offered her a ride. Because it was cold, "A" accepted the ride and there was friendly conversation about the weather. Upon reaching Eberhard's food store parking lot, "A's" destination, defendant insisted "A" accompany him on a short errand to get some marijuana. Though "A" said she didn't have time because she had to go to work, defendant convinced her. The atmosphere was still friendly.

After driving for a short time and further conversation about marijuana, defendant stopped the car, reached across "A" and pulled off the inside door handle on the passenger side of the car. Defendant then

---

**2.** The testimony of a third rebuttal witness was similar to that of the other two except that no charge was ever brought against Oliphant. Oliphant does not now challenge the use of the testimony of this third witness. All three women were white ladies of college age, one of whom attended Michigan State University.

crudely stated his intention to have intercourse with "A". "A" testified that defendant told her not to do anything to make him angry and to do as he ordered or he would "hurt" her, "shoot" her, and "kill" her. "A" could not leave the auto after defendant had suddenly become threatening and demanding, because the door handle had been removed. He asked her if she had ever dated a black man and she told him yes.

"A" was ordered to lie on the floor in the back of the car and take off her slacks and underwear while defendant continued to drive. Defendant then parked the car, removed his pants, and moved into the back seat. He had intercourse with "A" and then told her to replace her clothing and get back into the front seat. During the entire episode "A" was not struck or beaten, nor did she ever see a weapon, though the threats of harm were repeated.

Defendant stated he would drive her back to Lansing to her original destination. On the way, while still in the countryside, the car apparently ran out of gas. Defendant began to walk to a farm house. When alone, "A" searched the glove compartment for a gun, found none, and left the car and ran to a road commission truck to get help. The men from the road commission took "A" to the state police who, in turn, took her to a hospital for examination. No complaint was ever filed.

Witness "B" testified that she was a student at Michigan State University. On February 1, 1971 she was hitchhiking on Grand River Avenue to meet a friend in Okemos and look for a job. Defendant and another male picked her up in defendant's car and told her they would take her where she wanted to go. Conversation was friendly and touched the subjects of marijuana, defendant's job, and white women dating black men. Defendant also told "B" that he could get her a job and he would take her to his boss's house.

After stopping at a store, they arrived at a house in an area of Lansing unfamiliar to "B". Once inside the house, "B" was told that it was not the boss's house. Defendant

abruptly and crudely stated his intentions. By means of threats, "B" was forced to dance in the nude. Defendant then made her lie on the sofa and had intercourse with her. During this time, defendant threatened to shoot "B" up with heroin so she would not know what she was doing, handcuff her, and referred to a shotgun in the closet. After the second man, who had originally been in the car with defendant, also had intercourse with "B", she was given back her clothes and driven back to East Lansing.

"B" filed a complaint and the defendant was acquitted by a jury on the charge of rape on May 12, 1971.

Witness "C" testified that on February 5, 1971, while a student at Lansing Community College, she was hitchhiking in Lansing and was picked up by defendant. There was another male passenger in the car and "C" sat in the back seat. After some friendly conversation, defendant said he had to run a quick errand but, if "C" would ride along with him to a "chick's" apartment, he would give her a ride the rest of the way to her home. Upon arriving at the house, defendant persuaded "C" to come and meet the "chick." Once the three had left the car and entered the apartment, it became apparent that there was no "chick" there. Defendant then told "C" that he had brought her there to have intercourse and that only if she stripped naked and danced would she be allowed to leave. He told her "[y]ou've got five minutes to take off your clothes and dance or it's all over."

"C" tried to leave and was struck on the forehead by defendant's fist. "C" tried to kick defendant and there was a struggle. Defendant then threatened "C" with death and said he had killed others. The male passenger was called in to support defendant's statement that he had killed others. Defendant said he liked picking up "good looking white chicks" and having intercourse with them. "C" testified she was afraid she would be killed and so she took off her clothes and danced as defendant had ordered. Soon thereafter defendant pushed "C" down on the sofa and had intercourse

with her. Defendant later suggested "C" go to the police and offered to drive her there. He gave "C" his college identification card and asked her to remember his name and address. Defendant then took "C" to within two blocks of her home and dropped her off.

"C" filed a complaint and, on October 28, 1971, the defendant was acquitted on the charge of rape.

The people point out that all four alleged rapes occurred during a five-month period, and all four involved college-age women. All four incidents began with a public meeting and friendly conversation. In each case race was discussed, either in the context of interracial dating or racial prejudice. The conversations with all four women also touched on marijuana.

Witnesses "A", "B" and "C" entered defendant's car immediately, and complainant entered his car soon after their initial meeting. All four women got into defendant's car voluntarily and rode with him for a time expecting to go to a particular place but a deviation was made from the expected route, upon one excuse or another not likely to arouse fear on the part of the women. All four were then driven to an area unfamiliar to them where the intercourse took place.

Complainant and "C" were riding in a car with a seemingly friendly man, engaged in light conversation when, upon finding themselves in an unfamiliar area, the man became threatening and demanding. Witnesses "A" and "B" went with a seemingly friendly man on an "errand" to an unfamiliar apartment, whereupon the man became threatening and demanding. All four were told to submit or they would be harmed with a weapon of some kind though no weapon was produced. All four testified that they submitted to defendant's sudden and crudely spoken demands out of fear that they would be beaten and possibly killed if they didn't. Only "C" attempted to physically fight back in the face of defendant's threats. Aside from the short struggle with "C", the defendant did not beat or rip the clothes of any of the women.

Three were given a ride home, and witness "A" was being driven home when she escaped from the defendant's car.

In all of the cases there were apparent opportunities for the women to flee from defendant. The women testified that when these chances occurred, they did not feel the need to flee because defendant was friendly. After the frightening change in defendant's demeanor, the women were not allowed a chance to escape.

Defendant told witness "C" that she should go to the police and furnished her with his name and address and college identification card. Defendant told complainant that going to the police would be futile, since she couldn't prove anything and he had a tape recorder in the car. He then told complainant to be sure and get his license number. Both women went to the police station alleging rape against a man they apparently knew. Knowledge of defendant's name, address, college identification and car license numbers, along with other facts such as the lack of bruises and apparent opportunities to escape would tend to lessen the women's credibility when they told their story of rape.

We agree with the trial court and the Court of Appeals that the testimony of "A", "B", and "C" goes beyond tending to show that defendant raped other young women. The many similarities in all four cases tend to show a plan and scheme to orchestrate the events surrounding the rape of complainant so that she could not show nonconsent and the defendant could thereby escape punishment. Defendant's plan made it appear that an ordinary social encounter which culminated in voluntary sex had simply gone sour at the denouement due to his reference to complainant's unpleasant body odor; a vain and bitter woman seeking revenge against an innocent man. [*Id.* at 483–88, 250 N.W.2d 447–449]

The Court continued: "Here the similar acts were offered to prove a proposition— the plan or scheme, which was probative of a matter in issue—nonconsent. The testimony is material within the meaning of the statute." *Id.* at 489, 250 N.W.2d at 449.

The Court further stated:

Certainly, the fact that an individual commits a rape at one time has no bearing on whether another woman consented to intercourse at a later time. *Lovely v. United States*, 169 F.2d 386 (CA 4, 1948). Here, however, the people did not offer the prior acts to prove prior rapes, or that the defendant is a bad man with criminal propensities. The people offered the prior acts to show the scheme, plan or system employed by the defendant in raping the complainant *in a manner and under circumstances* which gave the appearance of consent should he meet with resistance.

It is true that even if a plan to orchestrate events to make it appear that the woman consented is shown, this is not conclusive proof that the woman did not consent. Evidence of such a plan, however, along with evidence of the other circumstances surrounding the intercourse, is both relevant and material to the issue of consent and therefore properly admissible under M.C.L.A. § 768.27; M.S.A. § 28.1050.

This statute was recently interpreted by this Court in *People v. Kelly, supra*, where we held the trial court did not err in admitting evidence of prior and subsequent acts of defendant which tended to show a scheme, plan or system, even where such acts also tended to prove prior crimes by the defendant [*Id.* at .491–92, 250 N.W.2d at 450 (footnote omitted).]

The Court further stated:

Concluding, as we do, that the testimony was "material" in compliance with the statute, we decline at this stage to upset the trial court's judgment as to the balance of probative value and prejudicial effect. The facts summarized above exhibit such similarities as to be probative of a plan or scheme. The dearth of evidence on consent, aside from the contradictory testimony of complainant and defendant, make evidence as to the circumstances of the incident particularly important in this case. We are not unmindful of the danger of this type of evidence prejudicing the jury against the defendant. On these facts, however, there is no basis to conclude that the trial judge who addressed the issue with great care, abused his discretion in concluding that the probative value was not substantially outweighed by the potentially unfair prejudicial effect.

The fact that the instant jury returned a verdict of guilty, while a prior jury which had not been presented the evidence of plan or scheme was unable to reach a verdict, does not prove that the evidence was unduly prejudicial, but suggests no more than that the instant jury may have found it probative. [*Id.* at 494–95, 250 N.W.2d at 451–452 (footnote omitted).]

The three young ladies who testified as to the similar acts had nothing to gain by doing so except distress. They did aid, however, in an important function, namely, in the administration of justice which may discourage other rapists intending to rape girls attending the Michigan State University.

In *People v. Johnston*, 328 Mich. 213, 43 N.W.2d 334 (1950) the Supreme Court of Michigan stated the general rule as follows:

The general rule on the subject is stated in 22 C.J.S. Criminal Law, § 691, p. 1118, in the following language:

"Similarly, evidence tending to show the commission of other offenses is admissible if it tends to show motive, system, method, or course of conduct, a plan or scheme to commit a series of crimes including the one on trial, or the intimate and apparently confidential relations between the informer and accused. On the other hand, evidence of other offenses which does not tend to prove the bribery charge should be excluded.

"The fact that accused was tried and acquitted of the other offense does not bar the introduction of evidence thereof in a prosecution for bribery where such evidence shows the general plan or system of the bribe, or illustrates accused's acts in the transaction on trial, or throws light on the later evidence."

In the instant case it is suggested that the doctrine of *res judicata* should be applied to preclude the introduction of testimony offered and received in the prosecution for conspiracy. The language of the second paragraph of the above quotation from C.J.S. is directly in point on this issue. Defendant is not on trial for the offense charged against him in the prior case. The question presently at issue is whether, as charged by the prosecution, he accepted a bribe in violation of the statute on which the information is based. Testimony tending legitimately to establish such offense, or some element thereof, may not be excluded solely on the ground that it was offered and received in the prior case as bearing on defendant's guilt of the offense there charged. [*Id.* at 226–27, 43 N.W.2d at 340]

## II

Oliphant relies on the decision of the Supreme Court in *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), in support of his claim of double jeopardy and collateral estoppel. Such reliance is misplaced. The Supreme Court of Michigan distinguished *Ashe* stating:

The keystone of defendant's argument is *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). *Ashe* involved a conviction for the robbery of a participant in a card game after the defendant had previously been acquitted of robbing another of the players in the same game. The Supreme Court held that the first jury had determined that the state had failed to prove defendant had been one of the robbers in the first trial and was, therefore, precluded from trying to prove the same fact in the second trial which was identical in all aspects except for the named victim. *Ashe* involved a single criminal episode and the relitigation of the same fact after it had been decided in defendant's favor in the first trial.

In the case at bar, the jury had to decide whether defendant raped complainant on June 1, 1971. The two other incidents testified to which resulted in acquittals were not part of the same criminal episode,[11] nor did they turn on the same crucial fact. An issue of fact. An issue of fact in each of the prior trials was whether "B" and "C" consented to the intercourse, or submitted as the result of the threat of force. These issues are distinct from the question of whether complainant consented to intercourse or submitted as the result of the threat of force. Assuming the only rational basis for the prior acquittals was a consent determination favorable to defendant,[12] this could in no way bar the people from proving nonconsent on the part of complainant.

[11] "B" was allegedly raped on February 1, 1971 and "C" was allegedly raped on February 5, 1971, while complainant was raped on June 1, 1971.

[12] In the prior trials for the rape of "B" and "C", defendant admitted he had intercourse but contended that it was consensual. In the case at bar, the people signed the following stipulation:

STIPULATION IN SUPPLEMENT OF THE RECORD

It is hereby agreed and stipulated by the parties that the record in this case be supplemented with the following information:

That in Ingham County Circuit Court case Number 22543, Charles Oliphant, defendant therein, was acquitted by a jury of the charge of rape MCLA 750.520; [MSA 28.788] on May 12, 1971; the complainant being [B].

That in Ingham County Circuit Court case Number 22741, Charles Oliphant, the defendant therein, was acquitted by a jury of the rape MCLA 750.520; [MSA 28.788] on October 28, 1971; the complainant being [C].

In each of the above cases Charles Oliphant judicially admitted that sexual intercourse took place between he [*sic*] and the complainant; but asserted that such act occurred voluntarily with the complainant's consent.

In each of the above cases the complainant claimed that the sexual intercourse with Charles Oliphant occurred as the result of the threat of force.

That in each of the above cases the complainants stated that they were over the age of 16 and Charles Oliphant did not contest such claim.

An issue of fact in each case for the jury to resolve was whether or not the sexual intercourse was voluntary or the result of the threat of force.

The foregoing stipulation is approved as to form and content.

[399 Mich. at 495–97, 250 N.W.2d at 452, 453.]

■ In this case the people were endeavoring to prove that Oliphant had engaged in similar, prior acts of "orchestration." The Supreme Court of Michigan held that such proof was "material" under state law. It was also not barred by collateral estoppel. The juries which acquitted Oliphant could easily have concluded both that Oliphant orchestrated the events surrounding the prior sexual encounters and that the women had in fact consented to his ultimate advances. *See Ashe, supra,* 397 U.S. at 444, 90 S.Ct. 1189. Since the state prosecutor did not seek to relitigate any issue which had previously been determined in Oliphant's favor, his claim of collateral estoppel is without merit.

■ To the same effect: *King v. Brewer,* 577 F.2d 435 (8th Cir. 1978); *Douthit v. Estelle,* 540 F.2d 800 (5th Cir. 1976) distinguishing *Blackburn v. Cross,* 510 F.2d 1014 (5th Cir. 1975); *United States v. Addington,* 471 F.2d 560 (10th Cir. 1973); *cf. United States v. Moore,* 522 F.2d 1068, 1079 (9th Cir. 1975), *cert. denied,* 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976). The substance of Oliphant's argument is simply an attempt to raise to a federal constitutional level his claim that certain evidence should have been excluded because the jury might have misused it. This is solely a question of state law on which the Supreme Court of Michigan has already decided against Oliphant. Moreover, even if the issue were properly before this Court, we note that questions concerning the admission of evidence that may be unfairly prejudicial are committed to the sound discretion of the trial court. *United States v. Phillips,* 575 F.2d 97, 100 (6th Cir. 1978); *United States v. Addington, supra,* 471 F.2d at 567, n.5; Fed.R.Evid. 403. Such discretion is not reviewable in a habeas proceeding.

### III

As a third, independent ground for the issuance of a writ of habeas corpus, Oli-

phant urges that the state trial court unconstitutionally excluded eighteen to twenty-one year olds from the petit jury array. Oliphant failed, however, to present this claim to the trial court until the first day of the second trial. The Supreme Court of Michigan held that this was not a timely presentation of the issue, and that the trial court should not have considered it. Refusing to consider the merits of the claim, the Court stated:

> We note that defendant first raised this challenge on the first day of his second trial when the basis for the objection had been apparent for some time. Thus, the objection, exhaustively discussed and denied on the merits by the trial court, ought to have been rejected as not timely under MCLA 600.1354; MSA 27A.1354. We decline to disturb the jury verdict on this point. MCLA 600.1354; MSA 27A.1354. [399 Mich. at 501, 250 N.W.2d at 455.]

■ In our opinion Oliphant is barred from raising this issue on federal habeas corpus because he has failed to make the required showing of cause and actual prejudice under *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976). In *Francis,* the Court held that such a showing would be required in cases involving untimely challenges to the composition of the indicting grand jury. We believe that the state's interest in the orderly administration of justice is no less compelling when the challenge is to the composition of the petit jury. *Accord, Evans v. Maggio,* 557 F.2d 430 (5th Cir. 1977); *Cunningham v. Estelle,* 536 F.2d 82 (5th Cir. 1976) (per curiam). Accordingly, since Oliphant has offered no valid excuse or cause for his procedural default under state law, and since he has failed to do more than allege prejudice, we believe that he is not entitled to raise the merits of the issue here.[3]

In sum, his conviction in the present case was affirmed by the Michigan Court of Appeals and by the Supreme Court of Mich-

---

**3.** Because of our disposition of the waiver issue, we also do not consider the respondent's claim that Oliphant is not presently in "custo- dy" within the meaning of 28 U.S.C. § 2254 on the gross indecency charge.

**556**

igan in carefully prepared and exhaustive opinions. The District Court likewise gave careful consideration to seven claims of error (only two were advanced in this Court on appeal) and in a well written opinion denied the writ of habeas corpus.

We are of the opinion that the state issues decided by the Michigan courts are not subject to collateral attack in a habeas petition filed in the federal court and that the Michigan courts correctly decided the constitutional issues of double jeopardy and collateral estoppel which were decided in conformity with the great weight of authority.

The judgment of the District Court denying the writ of habeas corpus is affirmed.

EDWARDS, Chief Judge, dissenting.

With all respect to my colleagues, I do not think this case can be decided without reference to the important issue of federal constitutional law which it presents. The Fifth Amendment to the United States Constitution says in part, "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb. . . ."

Here, two witnesses were allowed to testify that appellant (at times and places totally unrelated to the instant charge) performed acts which (if the testimony was believed) constituted the crime of forcible rape. Mich.Comp.Laws Ann. § 750.520. The constitutional problem is posed by the fact that in both of these instances that identical charge had been .filed by each of these two witnesses, appellant had been subjected to a jury trial, and the jury had found him "not guilty." To allow these same complainants to testify to these same events to buttress another complainant's charge of the same offense committed against her appears to me to allow appellant to be put in jeopardy twice in each such instance. Certainly the state should be estopped from relitigating the forcible rape issue, as was done here. *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

I dissent.