UNITED STATES of America,
Plaintiff-Appellee,

v.

Kenneth ERB, Mark C. Perschbacher, John E. Lavell, Michael S. Mosley,
Defendants-Appellants.

Nos. 77–1916 to 77–1919.

United States Court of Appeals,
Tenth Circuit.

Submitted Jan. 22, 1979.

Decided April 6, 1979.

Robert D. Bradley, Denver, Colo., for defendants-appellants.

Roland J. Brumbaugh, Asst. U. S. Atty., Denver, Colo. (Joseph F. Dolan, U. S. Atty., Denver, Colo., on brief), for plaintiff-appellee.

Before HOLLOWAY, BARRETT and McKAY, Circuit Judges.

BARRETT, Circuit Judge.

Kenneth W. Erb, Mark Clayton Perschbacher, John E. Lavell and Michael S. Mosley (hereinafter collectively referred to as appellants) appeal from jury convictions and judgments stemming from charges contained in a two-count superseding indictment. Count I charged a violation of 21 U.S.C.A. § 841, manufacture of methamphetamine and 18 U.S.C.A. § 2, aiding and abetting in such manufacture. Count II charged a violation of 21 U.S.C.A. §§ 841 and 846, attempting to manufacture methamphetamine and 18 U.S.C.A. § 2, aiding and abetting in such attempt. The Government elected to proceed to trial on Count I only. The jury returned verdicts of guilty against all defendants.

■ On appeal from a jury conviction, the evidence, both direct and circumstantial, together with all reasonable inferences to be drawn therefrom, must be viewed in the light most favorable to the Government. *United States v. Dingle*, 546 F.2d 1378 (10th Cir. 1976); *United States v. Addington*, 471 F.2d 560 (10th Cir. 1973); *United States v.*

*Twilligear*, 460 F.2d 79 (10th Cir. 1972). A review of the evidence in this light follows.

Ronald P. Torres, an officer assigned to the Drug Enforcement Administration (DEA) Task Force, attached an electronic tracking device to a vehicle bearing Colorado license plate SL–2581 being operated by one James R. Corwin after Torres was advised by a reliable informant that Corwin had said that he was then in the process of manufacturing methamphetamine, a controlled substance. Torres had previously supplied the informant with a quantity of phenyl-2-propanone (p-2-p) with instructions that she was to give it to a person named "Kenny" with whom she had been negotiating.

Torres and other DEA agents commenced surveillance of Corwin about 6:10 p. m., March 29, 1971. The informant had related that Corwin would, after various contacts, travel to a location in Denver where a clandestine laboratory was set up for the manufacture of methamphetamine. At about 6:30 p. m., the agents observed Corwin and a female child depart a residence at Wheatridge, Colorado, in a vehicle bearing the SL–2581 license plate. They followed the vehicle constantly. Among other things, the agents observed Corwin drive with the child, park the vehicle and enter an apartment which the informant had previously entered with the supply of p-2-p given her by Agent Torres, located at 9800 West 51st Place, Wheatridge, Colorado. Thereafter, at about 10:10 p. m., Corwin parked his vehicle and was observed walking a short distance to a residence located at 740 South Locust, Denver, carrying something. Following his arrival, the agents detected a strong odor of ether. They began surveillance of the house, the second of two houses on the same lot, set back about 60 to 90 feet from the house facing the street. The house was rented to appellant Mosley. Seven officers were involved initially in the surveillance. At the time of entry the number was about eleven.

Corwin remained in the 740 South Locust house for about one hour. He left, re-entered his vehicle and drove to an apartment complex with another individual. They thereafter left with a third party and drove in Corwin's vehicle to 16th and Ivanhoe where one of the persons left the car. At about 11:50 p. m., Corwin and the remaining unknown person drove to 1265 Downing Street where Corwin left the vehicle and entered yet another apartment complex. A few minutes later, Corwin returned to his vehicle. He and the unknown person then again drove to the 740 South Locust residence. They arrived there about 12:20 a. m. Some fifteen minutes later Corwin and an unknown person left that address and returned to the 9800 West 51st Place apartment.

At about 1:00 a. m., Agent Torres made telephone contact with his informant. The informant said that the process of manufacturing methamphetamine was under way and that the process would be completed about 8:00 a. m. when Corwin was to return to the clandestine lab to pick up his one-third yield of methamphetamine, reportedly some three ounces. During the entire period above referred to, the DEA agents detected a strong odor of ether emanating from the target residence at 740 South Locust.

At about 2:23 a. m., the agents observed Corwin again entering the 740 South Locust residence. He left shortly thereafter while the agents were discussing whether to enter the house. The strong odor of ether had emanated from the target residence at 740 South Locust continuously since 10:00 p. m. The agents knew, from their training and experience, that ethyl ether is an ingredient used by clandestine laboratory operators to manufacture methamphetamine.

At approximately 2:50 a. m., some eleven DEA agents forcibly entered the premises at 740 South Locust. They did so after Agent Torres and his immediate supervisor, Agent Ralph Lockridge, discussed the likelihood that in view of Corwin's unexpected departure from the residence at about 2:30 a. m. (rather than the 8:00 a. m. "pickup" time reported to Torres by his informant) it was necessary to enter without a warrant in order to protect against the removal of

methamphetamine, the dismantling of the laboratory and to protect against any explosions or fires which could occur as a result of the clandestine activities being conducted in the house. The officers believed that it would probably be at least two and possibly five hours before a search warrant could be obtained. [R., Vol. III, pp. 63–66; R., Vol. V, pp. 41–42.] Agent Torres believed that there was probable cause to then enter the house whose window blinds had been tightly drawn but whose lights had been on continuously during the surveillance in view of the heavy odor of ether which had continuously emanated from within, the information supplied by the informant, Corwin's reputation and background and his "commuting" activities that evening which verified the information relayed to Torres by the informant, i. e., that Corwin would make a number of contacts with persons and arrange for deliveries.

Prior to the decision to enter the house without warrant, Torres and his fellow DEA agents had been told on March 29, 1977, in conversations with their confidential informer, whose reliability had been tested on numerous prior drug investigation cases which had led to arrests, that James R. Corwin was in the process of manufacturing methamphetamine and that Corwin would be leaving an apartment premise at 9800 West 51st Place, Wheatridge, Colorado, in a 1974 black and yellow Plymouth Duster, bearing Colorado license plate number SL–2581 and would, following intermediate stops, proceed to a location where the clandestine laboratory to manufacture methamphetamine was located. It is significant here to observe that the information proved to be quite reliable in relation to Corwin's later movements and activities. Agent Torres knew, as a matter of his personal knowledge, that Corwin had associated with "dangerous people." This background, coupled with the continuous detection of the strong odor of ether emanating from the secluded small residence structure at 740 South Locust Street created compelling concern for action on the part of the agents when Corwin returned to the house about 2:30 a. m. instead of the projected 8:00 a. m. arrival earlier indicated by the informer for the purpose of collecting his (Corwin's) share of the manufactured methamphetamine. When Corwin left the residence shortly after his 2:30 a. m. arrival, the agents determined that it was necessary to effect a forced entry because of the possibility that the "cooking process" was being terminated, Corwin had departed with his "share" of the methamphetamine, the laboratory may then have been in the process of disassembly and removal together with the chemicals.

The agents made the forced entry of the residence at about 2:50 a. m. They first observed appellants Perschbacher, Mosley and Erb in the living room. Appellant Lavell jumped out of a back bedroom window. Agents stationed there arrested him. The four appellants were immediately gathered outside of the house where they were advised of their *Miranda* rights. When Torres was questioned with regard to this warrantless entry, he identified the "emergency circumstances" then existing, in his view, including his beliefs that the clandestine laboratory in the house may then have been in the process of disassembly and removal, the methamphetamine may have been destroyed, an explosion could occur in light of the chemicals present, and that Corwin and the people he was involved with were dangerous people. [R., Vol. III, pp. 72, 73.]

Torres confirmed that the "Kenny" referred to by his informant was in fact appellant Kenneth Erb, who had expressed his elation to the informant that the informant had obtained the p-2-p. Further, Torres stated that he knew that Corwin and other appellants had "associated with persons that had committed murder over the disclosure or involving a methamphetamine clandestine laboratory." [R., Vol. III, pp. 73, 74.] Torres, upon cross-examination, was interrogated in relation to probable cause to enter the house at 740 South Locust Street after Corwin had departed the residence:

Q. And so with Corwin gone at the time of the entry, you really had no information whatever about any of the individuals in the house. Is that not true?

A. I knew that they were associated with persons that had committed murder over the disclosure or involving a methamphetamine clandestine laboratory.

Q. You knew that Corwin associated with those persons?

A. That's true and I also knew that Kenny was associated with persons.

Q. In what respects?

A. That he was friends. That he knew them. That they negotiated business.

Q. But you didn't have any reason to believe that he was in that house?

A. As I stated at 1:00 when I talked to the informant, the informant stated that the conversations had taken place with Kenny Erb, and that—or with Kenny—and that he was elated that he had in fact gotten the p-2-p, and that he was in fact satisfied, and discussions of the laboratory occurred.

Q. What was the context between Erb getting the P-2-P and the activities in the house? Did you ask your informant specifically that question?

A. No.

Q. Did you have any facts at all to support either the allegation of the lab might be moved, or that the lab might explode? Or was this surmised on your part based on what had occurred in perhaps other cases that you had read or heard about?

A. The fact that on the 28th the lab had been moved and that Corwin was involved in that particular move . .

Q. But specific facts that would indicate to you that there was a real probability that the lab would be moved that very evening, did you have any facts like that?

A. That's a common practice.

    *    *    *    *    *    *

Q. And the same is true with regard to the lab exploding. You didn't have anything really that would lead you to believe that would actually occur, did you not? It's just that it has occurred in other places?

A. Volatile chemicals are present. And the possibility of explosion or fire is there. Whether or not it would happen, I don't know.

[R., Vol. III, pp. 73–75.]

Torres testified that he believed that there was sufficient evidence at hand to establish probable cause at 1:00 a. m. When asked whether Corwin's "coming and going" after 1:00 a. m. influenced the officers' deliberations (relative to forced entry without a warrant), Torres stated:

A. Yes, it did.

Q. In what way?

A. In that there was no way for us to know whether or not Corwin was removing items. He could have picked up amphetamine that was manufactured and carried it out in his pockets, or whatever.

[R., Vol. III, p. 76.]

When asked whether, with the various agents watching the house, he could have attempted to obtain a search warrant at 1:00 a. m., Torres responded that in his discussion with fellow officers they concluded that it would take several hours—perhaps upwards of five hours—to obtain the search warrant. When the matter was again discussed shortly after 2:00 a. m., an Assistant United States Attorney was present. The officers concluded, based on their own experience, that it would probably take "several hours" to obtain a search warrant and Torres was then satisfied that probable cause had been established. [R. Vol. III, pp. 87–91.]

When the agents effected forced entry of the house, they "hit doors simultaneously" and advised the occupants they were police officers. [R., Vol. III, pp. 91–93.] After the four defendants were taken into the yard and advised of their constitutional rights, the house was secured after the officers had decided to "seize and secure the house" which means that they had determined to "Enter the house, secure the persons in the home, assure that there wasn't any potential for fire or explosion because of volatile chemicals present, and then exit the house and secure the house until a

warrant was obtained." [R., Vol. III, pp. 34–36.] The agents departed the residence after making a hurried search for additional suspects and after quickly inspecting chemicals and chemical apparatus therein to insure against an explosion; further, the agents remained in the area outside of the house in order to prevent any change in the status quo while a search warrant was being obtained from the United States magistrate. [R., Vol. III, pp. 36–41; R., Vol. V, p. 49.]

The search warrant was obtained and Agent Torres and other DEA agents returned to the 740 South Locust residence and executed the search warrant at about 6:00 p. m., March 30, 1977. [R., Vol. V., p. 49.] Among the items seized and thereafter introduced in evidence, were numerous items of glassware, tubing and laboratory equipment, various chemicals which could be used to manufacture methamphetamine, methamphetamine itself, papers upon which appeared written chemical formulas for substances necessary in the manufacture of methamphetamine and to precipitate it from solution, i. e., methylamine, p-2-p, mercuric chloride, aluminum, and sodium hydroxide, certain fingerprints of Erb and Perschbacher, a syringe capable of being used to inject or administer methamphetamine, documents indicating that Mosley was the tenant of the house and the bottle which agents had earlier filled with p-2-p and delivered to Torres' informant. The Government established the chemical evidence and fingerprint identifications through expert witness Richard Ruybal, a forensic chemist with the DEA.

On appeal, the appellants allege that the trial court erred in: (1) denying their Motion to Suppress all of the evidence obtained as a result of the warrantless no knock forced entry, (2) making certain evidentiary rulings and giving jury instructions concerning testimony of a certain criminal offense charged against appellant John Lavell allegedly arising out of a transaction subsequent and independent of the offense charged in the case at bar, (3) refusing to grant the motions for acquittal filed by all of the defendants at the close of the Government's case and again after the defendants rested, (4) denying the defendants' Motion for Continuance, thus forcing the defendants to proceed to trial without the chemical analysis having been completed by a defense chemist, and (5) refusing to allow payment of costs in excess of $300.00 to the defense chemist.

I.

Appellants argue that the trial court erred in denying their Motions to Suppress and thereafter, at trial, admitting in evidence the various substances, documents and matters, obtained as a result of the search conducted pursuant to the search warrant on the grounds that this evidence was the fruit of the unlawful forced warrantless entry of the house effected at about 2:50 a. m.

The basic thrust of appellants' contention is, of course, that the 2:50 a. m. entry of the house by the DEA agents was without probable cause and the fruit of an unlawful forced entry made without a validly issued search warrant and absent evidence of exigent circumstances. We disagree.

■ In our view, the combination of facts within the knowledge of the DEA agents and the circumstances heretofore related did establish probable cause and exigent circumstances justifying the warrantless forced entry of the house at 2:50 a. m., the subsequent arrests of appellants, and adequate basis for the issuance of the search warrant by the United States Magistrate which was executed about 6:00 p. m.

Thus, we reject appellants' contention that the agents lacked probable cause and that exigent circumstances did not exist when they entered the house and there effected arrests and conducted the limited search at 2:50 a. m. on March 30, 1977.

The matters related to Agent Torres by his reliable informant concerning the act of manufacturing methamphetamine at a clandestine laboratory by Corwin and his associates on the evening of March 29, 1977, the type of vehicle Corwin was to be oper-

ating and the stops and contacts he was to make were all proven true by means of the surveillance employed. The strong odor of ether was detected emanating from the house set back from the street commencing at 10:00 p. m. and continuing through the entry some six and one-half hours later. The advice given to Agent Torres by the informant that Corwin intended to return to the clandestine laboratory at 740 South Locust to pick up his one-third yield of the manufactured methamphetamine at about 8:00 a. m. on March 30, 1977 proved to be incorrect. Instead, Corwin unexpectedly arrived at the laboratory much earlier than anticipated and departed therefrom at approximately 2:30 a. m. The DEA agents thus concluded that the "cooking" process was being terminated much earlier than anticipated. In addition Agent Torres personally knew Corwin as a dangerous person who had associated with others who were also dangerous persons. These circumstances, coupled with the DEA agents' experience in the matter of clandestine laboratory operations, the inherent explosive dangers in the operation, and knowledge that illicit contraband may be easily and quickly removed, secreted or destroyed, justified the forced entry, the warrantless arrests and the limited search in order to protect the agents and to secure the premises under the aura of probable cause and exigent circumstances until a search warrant was obtained.

In the case of *Thomas v. Parett*, 524 F.2d 779 (8th Cir. 1975), this quotation from a decision rendered by the Nebraska Supreme Court seems appropriate here:

> The exigency arose because the probability of the destruction of the evidence before the warrant could have been obtained. The officers could not count on the possibility that all the occupants would leave the premises at one time so that they could be arrested en masse outside the premises. If the individuals had left separately the arrest of the first would have alerted those staying behind who then could have rather readily, with the many hands available to do the work, washed the heroin down the sinks and toilet. The evidence was safe only so long as the operation remained undetected.
> 524 F.2d, at p. 782.

In *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), the Court reiterated the applicability of the rules earlier laid down in *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) relative to entry into a public place (in *Watson*, a restaurant) to effect a warrantless arrest. The Court held that the arrest was based on probable cause and fully comported with the Fourth Amendment. Significantly, the Government made no effort to show that circumstances precluded the obtaining of a warrant. Thus, *Watson* can be relied upon for the holding that the Fourth Amendment permits law enforcement officials to make warrantless arrests in public places based on probable cause notwithstanding that adequate opportunity exists to obtain a warrant. On its face, *Watson* would seem, by analogy, to authorize a warrantless search of a private place predicated upon probable cause. Such, however, is not clearly indicated. Mr. Justice Powell, in a concurring opinion in *Watson*, wrote:

> Since the Fourth Amendment speaks equally to both searches and seizures, and since an arrest, the taking hold of one's person, is quintessentially a seizure, it would seem that the constitutional provision should impose the same limitations upon arrests that it does upon searches. Indeed, as an abstract matter an argument can be made that the restrictions upon arrest perhaps should be greater. A search may cause only annoyance and temporary inconvenience to the law-abiding citizen, assuming more serious dimension only when it turns up evidence of criminality. . . . Logic therefore would seem to dictate that arrests be subject to the warrant requirement at least to the extent as searches.
> 423 U.S. at pp. 428, 429, 96 S.Ct. at p. 830.

Justice Powell's views in *Watson, supra,* were shared by Justice Brennan and Justice Marshall.

As a general rule, police officers must obtain a search warrant before entering a specific place to conduct a search for objects. *Agnello v. United States,* 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925). In contrast, no such determination need be made before a warrantless arrest in a public place is effected by a police officer armed with probable cause. *United States v. Watson, supra; United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976).

The Supreme Court has not decided (and in fact has clearly reserved this issue on a number of occasions) whether and under what circumstances the Fourth Amendment permits federal law enforcement officers to enter a private residence in order to effect a warrantless arrest for which the officers have probable cause. *See: United States v. Santana, supra; United States v. Watson, supra; Gerstein v. Pugh, supra; Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Jones v. United States,* 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958).

It has been consistently stated that the underlying purpose of the Fourth Amendment is to protect and shield citizens from unwarranted intrusions into their private domain. One has a reasonable expectation of privacy in the sanctuary of his home entitled to Fourth Amendment protection. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Thus, the inquiry in each case must turn on an assessment of the reasonableness of the privacy expectations. In employing the privacy interest analysis we must look to all of the facts and circumstances in order to ascertain the reasonableness of the warrantless entry and arrests. The Supreme Court has offered some important guidelines. In *Coolidge v. New Hampshire, supra,* the Court observed that it had generally elected to assume the validity of arrests and to decide cases on grounds other than the "more fundamental question of when the police may arrest a man in his house without a warrant." 403 U.S. at 476, 91 S.Ct. at 2043. The *Coolidge* Court recognized that a police entry into a home to effect an arrest is a "very substantial intrusion" (403 U.S. at p. 477, 91 S.Ct. 2022) and that warrantless entry of a man's house in order to arrest him on probable cause ". . . without warrant [is] . . . per se unreasonable in the absence of someone of a number of well-defined, 'exigent circumstances.'" 403 U.S. at pp. 477–480, 91 S.Ct. at p. 2044.

Thus, we must look to the facts and circumstances existing in the instant case at the time the DEA agents made the warrantless entry and effected the arrests in order to determine whether probable cause and exigent circumstances justified that action. We hold that the record abundantly supports the proposition that both probable cause and exigent circumstances existed, justifying the warrantless forced entry into the house, the warrantless arrests, the limited protective search, and the issuance and execution of the search warrant.

There is no indication that the DEA agents attempted to evade the warrant requirement. In fact, the opposite is true. The agents were conscientious, in our view, with respect to the need to establish probable cause before proceeding to arrest and secure. That determination was made following Corwin's departure from the house at about 2:30 a. m. We need not here recount the various considerations leading the agents to the conclusion that there then existed exigent circumstances. It cannot be fairly said that the DEA agents employed any subterfuge to gain access to the house in the absence of probable cause and exigent circumstances.

We have held that in determining whether an arrest or search warrant should have been obtained, we must evaluate the circumstances as they would have appeared to prudent, cautious and trained officers. *United States v. Brown,* 540 F.2d 1048 (10th Cir. 1976), *cert. denied,* 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1977); *United States v. Miller,* 460 F.2d 582 (10th Cir. 1972); *Trusty v. State of Oklahoma,* 360 F.2d 173 (10th Cir. 1966); *Murray v. United States,* 351 F.2d 330 (10th Cir. 1965), *cert. denied,* 383 U.S. 949, 86 S.Ct. 1207, 16 L.Ed.2d 211 (1966). We must be careful not

to pass judgment fortified with the unharried view provided by hindsight.

Finally, while the structure here entered was classified as a house, a residence or a home as distinguished from a public place, we would be hard pressed to find anything in the record indicating that it was *used* as a family abode or dwelling. Rather, the record indicates that it was a structure meeting the technical classification of a residence, a home, but, in addition, a structure apparently *used* for purposes other than family living or dwelling, i. e., a "laboratory" for the clandestine manufacture of a controlled substance in violation of federal law.

We hold that the trial court did not err in denying appellants' Motion to Suppress the evidence obtained as a result of the warrantless forced entry resulting in the valid arrests, the limited search and the subsequent issuance and execution of the search warrant. The evidence thus obtained was properly admitted in evidence.

### II.

Appellants contend that the trial court erred in permitting the Government, in the course of cross-examination of appellant Lavell, to inquire whether Lavell had been previously arrested on similar charges arising out of an incident occurring in Fort Collins, Colorado.

Before Lavell testified, the trial court had ruled that evidence of subsequent similar acts by Lavell would not be admissible by the Government in its case-in-chief for the purpose of providing the specific intent element of the offense charged. The Government complied with this ruling.

■ When Lavell testified in defense, he "opened the door" to the identical subject matter. He voluntarily testified that on the evening of March 29, 1977, he was not making methamphetamine but that he was only trying to ". . . extract any possible aromatic amine and possible solutions which would be there." [R., Vol. VI, p. 156.] He was obviously attempting to vitiate any proof of specific intent relating to

the charge in the instant case. Thereafter, Lavell went even further when he stated that while he had made methamphetamine on three prior occasions the last time was in December of 1975 which would be about fifteen months before the occasion of the charge here involved. It is thus apparent that Lavell "opened the door" to cross-examination on the subject of those acts and a subsequent similar act which the Government interrogated him about over strong objection.

The Government inquired of Lavell, in cross-examination, about his arrest in Fort Collins on similar charges which occurred on April 8, 1977. On rebuttal, the Government called one Julie Williamson, a Special DEA Agent, who testified that on April 8, 1977, following a telephone conversation with Lavell (she was acting in an undercover capacity) she agreed to deliver and soon thereafter did in fact deliver to Lavell 500 gram bottles of p-2-p near Longmont, Colorado, for the purpose of his cooking methamphetamine and that she was to be paid her "share" in money when it was processed shortly thereafter. [R., Vol. VII, pp. 13–18.]

We hold that the challenged cross-examination and the Williamson rebuttal testimony were properly admitted in that they were aimed at probing the truthfulness of Lavell's direct testimony, obviously elicited to show his lack of intent. Accordingly, they were probative of the element of intent placed squarely in issue by Lavell. The inconsistent statements which he made on April 8, 1977, prior to his trial testimony, materially related to his credibility. Thus, they were admissible to properly probe veracity and test credibility. *See:* Fed.Rules of Evid., Rule 608(b)(1), Rule 613(b) and Rule 611(b), 28 U.S.C.A.

■ We further hold that the trial court's cautionary instruction admonishing the jury to consider the evidence of other alleged wrongs attributable to Lavell to establish his course of conduct, scheme, design or intent sufficiently dissipated any possible prejudice to the remaining defendants. *Lowther v. United States*, 455 F.2d

657 (10th Cir. 1972), *cert. denied,* 409 U.S. 857, 93 S.Ct. 139, 34 L.Ed.2d 102 (1972); *Beckwith v. United States,* 367 F.2d 458 (10th Cir. 1966).

### III.

■ Appellants contend that the trial court erred in refusing to grant their Motions for Judgments of Acquittal at the close of the Government's case and when renewed after the parties had rested.

We deem our previous detailed review of the facts and circumstances adequate to suffice for our holding that this contention is without merit.

Our review shows that the evidence, both direct and circumstantial, together with all reasonable inferences to be drawn therefrom, was substantial and sufficient to support the jury verdicts of guilt beyond a reasonable doubt. *United States v. Walton,* 552 F.2d 1354 (10th Cir. 1977), *cert. denied,* 431 U.S. 959, 97 S.Ct. 2685, 53 L.Ed.2d 277 (1977); *United States v. Guerrero,* 517 F.2d 528 (10th Cir. 1975); *United States v. Acree,* 466 F.2d 1114 (10th Cir. 1972), *cert. denied,* 410 U.S. 913, 93 S.Ct. 962, 35 L.Ed.2d 278 (1973).

### IV.

■ We hold that the trial court did not abuse its discretion in refusing the defendants' motion for continuance based upon the contention that the defense chemist had not been provided samples of the seized drug items in adequate pre-trial time to testify to their analysis. The record quite clearly shows that the defense was in physical possession of the chemicals well before trial but that the expert chemist was not requested or directed to perform the particular analysis in issue by defense counsel until July 25, 1977, during trial, notwithstanding that the samples were made available and were in his possession four days prior thereto. [R., Vol. VI, pp. 190–193.] Defense counsel had, prior to trial, acknowledged to the court that the defense chemist was in readiness to make his analysis and that the chemicals had been physically delivered together with the Government expert chem-

ist's analysis reports. [R., Vol. IV, pp. 27–29.] Thus, adequate opportunity existed prior to trial and the motion for continuance was not well taken. *United States v. Schrenzel,* 462 F.2d 765 (8th Cir. 1972), *cert. denied,* 409 U.S. 984, 93 S.Ct. 325, 34 L.Ed.2d 248 (1972).

■ The grant or denial of a motion for continuance is a matter subject to the trial court's sound discretion and will not be disturbed on appeal absent a showing of clear abuse of discretion resulting in manifest injustice. *United States v. Mundt,* 508 F.2d 904 (10th Cir. 1974), *cert. denied,* 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975). No such showing has been made here.

### V.

Finally, appellants urge that the en banc trial court erred in ruling that the forensic chemist hired by the defense counsel to represent all of the defendants was entitled only to the sum of $300.00.

Defendants contend that they clearly imparted notice to the trial court that when they moved for the authorization to employ a forensic chemist on their behalf under 18 U.S.C.A. § 3006A(e)(3) that it was intended the allowance be $300.00 for each defendant rather than the total sum of $300.00 allowed.

The statute reads, in pertinent part:

Compensation to be paid to a person for such services rendered by him . . shall not exceed $300, exclusive of reimbursement for expenses reasonably incurred. . . .

18 U.S.C.A. § 3006A(e)(3).

■ In our view there is nothing in the record which reflects that the trial court expressly or impliedly indicated that the forensic chemist employed by the defendants would be rendering services in his expert capacity for them individually rather than collectively. To the contrary, the trial court saw the services to be rendered in the collective sense. Furthermore, the defendants have failed to establish a necessity or

justification for an allowance beyond the sum of $300.00 for the services rendered. An excess payment must, in any event, be approved by the Chief Judge of this Court. *See:* 18 U.S.C.A. § 3006A(e)(3). The requisite showing of necessity has not been made. *United States v. Mundt, supra; United States v. Crim,* 527 F.2d 289 (10th Cir. 1975), *cert. denied,* 425 U.S. 905, 96 S.Ct. 1497, 47 L.Ed.2d 755 (1976).

WE AFFIRM.

McKAY, Circuit Judge, concurring:

I fully concur in the opinion of the court except to the extent that it may be read to imply that a warrantless arrest or search may be effected in a private residence without the concurrence of both probable cause and exigent circumstances or that the facts shown would warrant a finding that the building in this case was a "public" building. While I do not read the opinion as going that far, I wish to emphasize my understanding in this regard, since it forms the basis of my concurrence.