**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 14 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.                                             No. 01-2246

JOEL DEAN RHIGER,

      Defendant-Appellant,

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CR-99-782-BB)**

---

Benjamin A. Gonzales, Assistant Federal Public Defender, Albuquerque, New Mexico, for Defendant-Appellant.

David N. Williams, Assistant United States Attorney (David C. Iglesias, United States Attorney, with him on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **SEYMOUR**, **BALDOCK** and **BRISCOE**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Joel Rhiger appeals his conviction for conspiring to manufacture methamphetamine in violation of 21 U.S.C. § 846 and for possessing methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). We affirm.

**I**

Prior to Mr. Rhiger's arrest, federal drug agents observed him driving Carl Baker and another companion to several locations where Mr. Baker and the companion bought materials used to manufacture methamphetamine. Agents also learned that less than a week earlier, Mr. Rhiger had purchased ingredients used to make methamphetamine. The agents then tracked Mr. Rhiger and Mr. Baker to the home of Randy Brown, where they observed the two men entering the residence with the purchased materials. After watching the home for an hour, the federal agents detected the smell of cooking methamphetamine. Fearing an active methamphetamine lab was in the residence and could explode, the agents entered the home without a warrant. They found an active lab in the garage, immediately arrested Mr. Baker, and arrested Mr. Rhiger after finding him hiding in the shower in the master bathroom. The agents shut down the lab, secured the residence, and took steps to obtain a warrant so they could conduct a further search of the building.

Mr. Rhiger, Mr. Baker, and Mr. Brown were indicted for the methamphetamine crimes arising out of the evidence obtained in the search of the home. Mr. Rhiger's two co-defendants pled guilty, and a jury convicted Mr. Rhiger on all counts.

On appeal, Mr. Rhiger challenges the district court's denial of his motion to suppress evidence obtained by agents during the warrantless search of Mr. Brown's home. He asserts the district court erred in finding that exigent circumstances justified the agents' entry of the Brown residence. Mr. Rhiger also contends the district court erred in permitting a government agent to testify regarding the agent's detection of methamphetamine odors on Mr. Rhiger's clothing.

**II**

As an initial matter, the government contends that Mr. Rhiger has no standing to object to the search of Mr. Brown's house. We must therefore decide whether Mr. Rhiger's individual constitutional rights were affected by the agents' actions. *See United States v. Rubio-Rivera*, 917 F.2d 1271, 1274 (10th Cir. 1990). "To so demonstrate in the context of a search, the defendant must show that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable." *United States v.*

*Higgins*, 282 F.3d. 1261, 1270 (10th Cir. 2002) (internal quotation omitted). We review *de novo* whether Mr. Rhiger's expectation of privacy in the searched premises was one society would consider reasonable. *Id.*

While Mr. Rhiger did not permanently reside with Mr. Brown, he testified he had known Mr. Brown for about two weeks and stayed overnight at Mr. Brown's residence "a couple, three times," rec., vol. V at 240, "four tops," *id.* at 253, when he was too intoxicated to drive home, and that he and Mr. Brown "hit it off" because of their common interest in maintenance work, *id.* at 239. Mr. Brown's neighbor, Paul Dressendorfer, testified that for several days he "never saw [Mr. Rhiger's car] leave" Mr. Brown's house. *Id.*, vol. IV at 74. Receipts left by Mr. Rhiger were found in the Brown residence. Moreover, Mr. Rhiger testified that on the day the federal agents searched the Brown home, he had entered the house in Mr. Brown's absence and retired to Mr. Brown's bedroom to take a nap. The question is thus whether Mr. Rhiger has standing as a social guest to challenge the government's search of Mr. Brown's home.

Our decision is guided by the Supreme Court's reasoning in *Minnesota v. Carter*, 525 U.S. 83 (1998). Although the Court did not specifically decide the issue we face, a close reading of the opinion persuades us that a social guest's expectation of privacy is constitutionally protected.

The majority in *Carter* ruled that an individual does not possess an

expectation of privacy to challenge the search of another's property when he or she is present solely for commercial or business reasons. But the Court drew a clear distinction between the status of individuals present at a residence for social purposes and those present for business or commercial matters. *Id.* at 90-91. Referring to *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990) (overnight guests possess an expectation of privacy in searched premises), the Court pointedly contrasted the status of a guest who has a "degree of acceptance into the household" from a guest present for "purely commercial" reasons, noting the former possessed a far greater expectation of privacy in the premises than the latter. *Carter*, 525 U.S. at 90.

Our reading of the majority's distinction between social and commercial guests is buttressed by the concurring opinions of Justices Kennedy and Breyer and themes in Justice Ginsburg's dissent. Justice Kennedy joined the majority's opinion because its reasoning was "consistent with [his] view that almost all social guests have a legitimate expectation of privacy, and hence protection against unreasonable searches, in their host's home." *Id.* at 99 (Kennedy, J., concurring). Describing which social guests could benefit from such protection, Justice Kennedy noted guests must establish they have a "meaningful connection" to the residence. *Id.* at 101. He further urged in partial support of Justice Ginsburg's dissent "that reasonable expectations of the owner . . . [should be] . . .

shared, to some extent, by the guest. This analysis suggests that, as a general rule, social guests will have an expectation of privacy in their host's home." *Id.* at 102. Justice Ginsburg's assertion that any type of guest should be able to "share his host's shelter against unreasonable searches and seizures," *id*. at 106 (Ginsburg, J., dissenting), received additional support from Justice Breyer. While he joined the majority's opinion on other grounds, he nonetheless stated, "I agree with Justice Ginsburg that respondents can claim the Fourth Amendment's protection." *Id.* at 103 (Breyer, J., concurring).

Our determination that a social guest has a sufficient expectation of privacy to challenge unreasonable searches of his host's home is further bolstered by the Court's reference in *Carter* to *Jones v. United States*, 362 U.S. 257 (1960). The Court acknowledged *Jones*' specific ruling "that 'anyone legitimately on the premises where a search occurs may challenge its legality' was expressly repudiated in *Rakas v. Illinois*, 439 U.S. 128 (1978)." *Carter*, 525 U.S. at 89-90 (citing *Jones*, 362 U.S. at 267). Nonetheless, the Court agreed with *Jones*' ultimate conclusion that the search of an apartment belonging to the defendant's friend, where the defendant slept there "maybe a night," *Jones*, 362 U.S. at 259, kept some clothing there, and entered at his own will, violated the defendant's Fourth Amendment rights. *Carter*, 525 U.S. at 89-90. *See also Rakas*, 439 U.S. at 142 ("We think that *Jones* on its facts merely stands for the unremarkable

proposition that a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable government intrusion into that place."); *Olson*, 495 U.S. at 97-98 (noting and approving Court's reaffirmation in *Rakas* of *Jones*' factual holding).

While the Court did not specifically decide in *Carter* that a social guest can challenge a warrantless search of his host's home, the majority decision, coupled with the concurrences of Justices Kennedy and Breyer, and the dissent of Justice Ginsburg, persuade us that Mr. Rhiger had a legitimate expectation of privacy as a social guest in Mr. Brown's home. *See also United States v. Pollard*, 215 F.3d 643, 647-48 (6th Cir. 2000) (defendant had reasonable expectation of privacy in premises where he had friendship with homeowner, occasionally spent night at residence, kept some personal belongings there, and was permitted to be in home while owners were absent). Mr. Rhiger's regular presence at the home, his overnight stays, the discovery of his receipts in the house, and his comfort in entering the residence unannounced and taking a nap, all support our determination that Mr. Rhiger had an ongoing and meaningful connection to Mr. Brown's home as a social guest. Therefore, Mr. Rhiger has standing to challenge the government's search and seizure of evidence from the Brown residence.

## III

Given Mr. Rhiger's legitimate expectation of privacy in the Brown residence, we address whether the district court properly denied Mr. Rhiger's motion to suppress evidence based on its determination that exigent circumstances justified the agents' warrantless entry into the Brown home. In reviewing the district court's ruling, we examine the "court's factual findings under the clearly erroneous standard and view the evidence in the light most favorable to the district court's findings. The ultimate question regarding the reasonableness of the search is a question of law which we review *de novo*." *United States v. Parra*, 2 F.3d 1058, 1063 (10th Cir. 1993) (internal citation omitted). Based on this standard, we conclude the district court properly denied Mr. Rhiger's motion to suppress.

"It is a basic 'principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (citing *Coolidge v. New Hampshire*, 403 U.S. 433, 477-78 (1971)). "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590. *See also United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir. 1992); *United States v.*

*Aquino*, 836 F.2d 1268, 1271 (10th Cir. 1988).

The government maintains exigent circumstances existed because the federal agents reasonably believed an active methamphetamine lab in the Brown home posed a threat of explosion to its inhabitants, to the agents present at the scene, and to the other residents in Mr. Brown's immediate neighborhood. Threats to public safety are widely accepted as one of the exigent circumstances exceptions to the Fourth Amendment's warrant requirement. *See Warden v. Hayden*, 387 U.S. 294, 298-99 (1967) ("The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others."); *United States v. Walsh*, 299 F.3d 729, 734 (8th Cir. 2002) (danger associated with suspected methamphetamine lab sanctioned warrantless search by police officers); *United States v. Wicks*, 955 F.2d 964, 970 (10th Cir. 1993) (agents may conduct warrantless searches "if they believe that their own lives or the lives of others are at risk"); *United States v. Wilson*, 865 F.2d 215, 216-17 (9th Cir. 1989) (officer's fear methamphetamine lab would explode justified warrantless entry into home); *cf. United States v. Spinelli*, 848 F.2d 26, 29-30 (2nd Cir. 1988) (officer's concern regarding volatile nature of methamphetamine justified failure to comply with knock-and-announce statute).

The government bears the burden of establishing exigency. In our assessment of whether the burden is satisfied, "we are guided by the realities of

the situation presented by the record." *Wicks*, 995 F.2d at 970 (internal quotations omitted).  "We should 'evaluate the circumstances as they would have appeared to prudent, cautious and trained officers.'" *United States v. Cuaron*, 700 F.2d 582, 586 (10th Cir. 1983) (quoting *United States v. Erb*, 596 F.2d 412, 419 (10th Cir. 1979)).  We have determined the

> basic aspects of the "exigent circumstances" exception are that (1) the law enforcement officers must have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others, (2) the search must not be motivated by an intent to arrest and seize evidence, and (3) there must be some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched.

*Wicks*, 995 F.2d at 970 (quoting *United States v. Smith*, 797 F.2d 836, 840 (10th Cir. 1986)); *Anderson*, 981 F.2d at 1567.  Nevertheless, "there is no absolute test for the presence of exigent circumstances, because such a determination ultimately depends upon the unique facts of each controversy." *Wicks*, 995 F.2d at 970 (internal quotation and citations omitted).

In a very short ruling from the bench after an evidentiary hearing, the district court found the officers' knowledge that iodine, phosphorus, ice and cotton balls had been purchased by defendants, coupled with the strong odor of methamphetamine cooking, justified the officers' belief that there was a danger to the public amounting to exigent circumstances.  Reviewing the record in light of the factors cited in *Wicks*, we agree exigent circumstances existed justifying the

agents' warrantless entry into the residence.

The government presented evidence indicating the federal agents had reasonable grounds to believe there was an immediate need to protect themselves and the public from the potential explosion of the methamphetamine lab in Mr. Brown's home.[1] Agent Mallory,[2] who oversaw the operation resulting in Mr. Rhiger's arrest, testified the heat generated from methamphetamine production "can be very intense [and] can cause fires," rec., vol. III at 27, and that vapors from the manufacture of methamphetamine "are very, very flammable . . . [and] in large quantities can produce a large explosion, causing a danger for the surrounding public." *Id.* at 38.

Agent Mallory and his colleagues reasonably believed methamphetamine was being produced in the Brown residence based on their surveillance of Mr.

---

[1]We disagree with the dissent's assertion that the government's reliance on the public safety exception is unconvincing. This exception arises when "law enforcement officers . . . have reasonable grounds to believe that there is an immediate need to protect *their lives or others* . . . ." *Wicks*, 995 F.2d at 970 (emphasis added). That Mr. Brown's home was relatively isolated from the other homes in his neighborhood is of little consequence. The investigating officers, along with Mr. Rhiger and Mr. Baker, could have been injured if the lab exploded.

[2]Agent Mallory worked for the local sheriff's department and was assigned to the United States Drug Enforcement Task Force, where he worked primarily for the Clandestine Laboratory Team. He had received over 200 hours of instruction regarding the manufacture of methamphetamine, and the investigation and dismantling of methamphetamine labs. Agent Mallory also had been directly involved in the investigation and cleanup of at least 125 methamphetamine labs.

Rhiger and their observation of Mr. Brown's home. Prior to their entry of the Brown residence, the federal agents had spent several hours tracking the activities of Mr. Rhiger. During that time, Mr. Rhiger was observed with two companions, Christopher Dunlap and Mr. Baker, who purchased chemicals and other materials used in the production of methamphetamine. In addition, the agents confirmed that six days earlier, Mr. Rhiger had purchased iodine, an ingredient also used to produce methamphetamine. After leaving Mr. Dunlap at another location, Mr. Rhiger and Mr. Baker drove to Mr. Brown's home and then entered the building. The agents established surveillance of the home and watched for evidence of the manufacture of methamphetamine. After about an hour, agents stationed to the south of the home became aware of "a very strong odor of methamphetamine being manufactured," which they believed was coming from the Brown residence. *Id.* at 32, 59, 61, 64. When the agents radioed to Agent Mallory that they had detected the smell, he joined them at their location where he "was overcome by the odor of methamphetamine being manufactured, emitting from the northwest," the direction of Mr. Brown's home in relation to agents' surveillance position. *Id.* at 33. During the next half-hour, Agent Mallory took steps to establish the odor was not coming from the mobile home immediately next to where the agents were stationed. After questioning the resident of the mobile home, performing a consensual search of its interior, and determining no illegal drug activity was

-12-

occurring there, Agent Mallory believed he "had exigent circumstances that the manufacturing process [of methamphetamine] was occurring" in the Brown residence, *id.* at 34, and that for the purposes of public safety, it was necessary to enter the building, and shut the lab down, *id.* at 71.

Evaluating these facts under the objective standard of a "prudent, cautious and trained" officer, *Cuaron*, 700 F.2d at 586, we hold the government's evidence regarding Mr. Rhiger and Mr. Brown's purchase and possession of materials used to manufacture methamphetamine, the strong odor of cooking methamphetamine emitting from the Brown residence, and Agent Mallory's knowledge of the inherent dangerousness of an active methamphetamine lab, establishes that reasonable grounds existed for the agents to believe there was an immediate need to protect the public by entering the home and discontinuing the lab's production.[3]

---

[3]The half-hour gap between Agent Mallory's detection of the methamphetamine smell and entry of the home does not dissuade us from our conclusion that a "prudent, cautious and trained" officer, *Cuaron*, 700 F.2d at 586, would have determined a threat to public safety existed and warrantless entry into the home was justified. Viewed objectively, the record provides ample evidence regarding the inherent volatility of a methamphetamine lab, and of the agent's reasonable belief of its existence in the Brown residence. That Agent Mallory waited half an hour to enter the residence does not undermine the objective evidence that cooking methamphetamine is an exceptionally dangerous process.

Similarly, we reject the dissent's contention that the officers had "sufficient information and adequate opportunity to seek a search warrant prior to entering the residence." The time required to obtain the search warrant may have exposed the officers, Mr. Rhiger and Mr. Baker, to the danger of the lab's potential

(continued...)

There is also no evidence the agents entered the home with an intent to arrest and seize evidence. Rather, as discussed above, they were motivated out of a concern for public safety. Agent Mallory testified "it's a very hazardous environment. It's explosive. There are poisonous gases coming off." *Id.*, vol. IV at 215. Therefore, "we needed to get in, and we needed to shut this thing down for public safety." *Id.*, vol. III at 35. Agent Mallory further testified that upon entering the Brown residence and discovering an active lab in production, "[t]he first thing we did . . . was we removed the heat . . . . That was very necessary. We did not want that reaction to cause any volatile reactions. So we wanted to remove the heat and get [the lab] shut off and cooled down." *Id.*, vol. IV at 134. Only after the agents detained defendants, turned off the heat, and obtained a search warrant, did they re-enter the premises and conduct a full and thorough search.

Finally, the agents had a "reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched." *Smith*, 797 F.2d at 840. The agents' observations of Mr. Rhiger and his colleagues purchasing materials used to produce methamphetamine, their detection of the strong odor of

_____

[3](...continued)
explosion for a period even longer than the half-hour between the agents' detection of the smell of cooking methamphetamine and their entry into the home.

-14-

cooking methamphetamine,[4] and their awareness of the potential explosiveness of an active methamphetamine lab, establish that more than enough evidence exists for us to conclude the agents had a reasonable basis, if not probable cause, to associate an emergency with the place to be searched. Consequently, their warrantless entry of the residence was justified. *See Walsh*, 299 F.3d at 734 (strong smell of ether, evidence of laboratory equipment used to produce methamphetamine, residue suggesting on-going production of the drug, and police concerns that active heat source might be present, established exigent circumstances permitting officer to enter structure without a warrant); *Wilson*, 865 F.2d at 216-17 (strong smell of chemical fumes, activity in suspected methamphetamine lab, and liquid ether spilling out of same space substantiated officer's fears regarding public safety and warranted his entry into garage);

---

[4]Mr. Rhiger contends the "district court erred in finding that the odor associated with the manufacture of methamphetamine satisfied the government's burden of proving that sufficient exigency existed to justify the warrantless entry of Mr. Brown's home." Aplt. brief at 18. While the district court did note "a plain view rule for odors" or a "plain smell rule" was developing in the law, rec., vol. III at 88, it did not conclude exigent circumstances existed *solely* because the agents detected the smell of cooking methamphetamine. Rather, the district court listed several factors (only one of which was the smell of cooking drugs) whose collective force established exigency. *Id.* Case law establishes that odor, coupled with other relevant facts, can support an exigency argument. *See United States v. Scroger*, 98 F.3d 1256, 1259 (10th Cir. 1996); *United States v. Erb*, 596 F.2d 412, 415 (10th Cir. 1979). *See also United States v. Walsh*, 299 F.3d 729, 734 (8th Cir. 2002); *United States v. Wilson*, 865 F.2d 215, 216-17 (9th Cir. 1989); *United States v. Brock*, 667 F.2d 1311, 1318 (9th Cir. 1982).

-15-

*Spinelli*, 848 F.2d at 29-30 (police knowledge of volatile nature of methamphetamine, and fear that defendant would try to destroy evidence by causing explosion in lab, established exigent circumstances); *Brock*, 667 F.2d at 1314-15 (smell of cooking methamphetamine and officer's observation of defendant choking on fumes supported officer's fears of potential explosion and justified warrantless entry into mobile home); *Erb*, 596 F.2d at 417-18 (strong smell of ether emitting from house for over six hours, reliable tips from informant, and officer's fear that defendant might try to destroy evidence and that methamphetamine lab could cause danger to public, established exigent circumstances allowing warrantless entry of dwelling). *But see United States v. Warner*, 843 F.2d 401, 404 (9th Cir. 1988) (officer's knowledge of potential explosive nature of stored chemicals, but lack of perception of an immediate emergency, did not justify warrantless entry of unoccupied garage); *United States v. Bonitz*, 826 F.2d 954, 957 (10th Cir. 1987) (officer's alleged fears regarding explosive nature of undisturbed gun powder and ammunition was not sufficiently supported by record to establish exigent circumstances); *United States v. Jackson*, 199 F.Supp.2d 1081, 1090 (D. Kan. 2002) (despite officer's detection of strong chemical odor and suspicion that methamphetamine was being produced in residence, government failed to prove existence of exigent circumstances because no testimony was offered regarding danger of explosion or volatility of

methamphetamine).

Based on the preceding analysis, we conclude the federal agents had "reasonable grounds to believe that there [was] immediate need to protect" the public, their search was not "motivated by an intent to arrest and seize evidence," and there was a "reasonable basis, approaching probable cause, to associate an emergency with" the Brown residence. *Smith*, 797 F.2d at 840. The district court correctly determined that exigent circumstances justified the agents' warrantless entry into Mr. Brown's home, and properly denied Mr. Rhiger's motion to suppress evidence.

**IV**

Finally, Mr. Rhiger maintains the district court erred in permitting Agent Mallory to testify he detected the odor of methamphetamine on Mr. Rhiger's clothing when arresting him. Because Mr. Rhiger failed to object at trial to Agent Mallory's testimony, we review this issue under the plain error standard. *See Johnson v. United States*, 520 U.S. 461 (1997).

In *Johnson*, the Supreme Court outlined the elements required under the plain error test.

> [B]efore an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if

-17-

(4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.

*Johnson*, 520 U.S. at 466-67 (alterations in original) (internal quotations and citations omitted). Even if Mr. Rhiger were to satisfy the first three prongs of the test, he fails to establish that any such error "seriously affect[ed] the fairness, integrity, or public reputation of [his] judicial proceedings."[5] *Id.* at 467. The government presented more than enough evidence for a jury to determine Mr. Rhiger was guilty of the charges against him, and the absence of Agent Mallory's testimony regarding the smell of Mr. Rhiger's clothes would not have altered that result. The evidence showed that Mr. Rhiger purchased materials used to produce methamphetamine. He aided his companions in purchasing materials for the manufacture of the drug. He entered a home in which there was an active methamphetamine lab. Finally, he was found hiding in a shower in a back

---

[5]The district court accepted Agent Mallory as an expert witness in the field of methamphetamine production and the investigation of illegal laboratories. Rec., vol. IV at 114. It appears Mr. Rhiger believes that if Agent Mallory were offering expert testimony regarding the smell on Mr. Rhiger's clothing, the district court should have vetted Agent Mallory's opinion in a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-95 (1993). Conversely, if Agent Mallory were offering lay testimony regarding the smell on Mr. Rhiger's clothing, Mr. Rhiger asserts the district court should have informed the jury as such. Without such information, Mr. Rhiger contends, the jury may have inappropriately attributed heightened credibility to Agent Mallory's statement and used his testimony as its sole basis for finding Mr. Rhiger was present in the garage of Mr. Brown's home, thus establishing his guilt. We need not reach the merits of Mr. Rhiger's claims. Even if his assertions showed the district court plainly erred, he cannot prove the requisite prejudice.

bedroom of the home when the agents entered the building to shut down the lab. "On this record there is no basis for concluding that the error seriously affect[ed] the fairness, integrity, or public reputation of [Mr. Rhiger's] judicial proceedings." *Id.* at 470 (internal quotation omitted). The district court did not commit plain error.

The judgment of the district court is **AFFIRMED.**

**No. 01-2246, <u>United States v. Rhiger</u>,**

**BRISCOE, Circuit Judge, concurring and dissenting:**


I agree with the majority's conclusion that Rhiger has standing to contest the officers' entry into the residence. However, I disagree that exigent circumstances excused the officers' warrantless entry. Since entry into the residence was not supported by either a warrant or exigent circumstances, I would conclude the district court erred in denying the motion to suppress and, as a result, I would reverse the conviction and remand for new trial.

As accurately noted by the majority, a warrantless entry into a residence is presumptively unreasonable under the Fourth Amendment. <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980). A warrantless entry may be justified, however, where officers believe their own lives or the lives of others are at risk. <u>United States v. Wicks</u>, 995 F.2d 964, 970 (10th Cir. 1993). Where the exigent circumstance claimed is protection of the public, the requirements are that (1) law enforcement officers must have reasonable grounds to believe there is an immediate need to protect the public or the public's property; (2) the search must not be motivated by an intent to arrest and seize evidence; and (3) there must be some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched. <u>United States v. Smith</u>, 797 F.2d 836, 840 (10th Cir. 1986).

The burden is on the government to show exigency. <u>Wicks</u>, 995 F.2d at

970. In assessing whether this burden has been met, the court evaluates the circumstances as they would have appeared to prudent, cautious, and trained officers. United States v. Scroger, 98 F.3d 1256, 1259 (10th Cir. 1996). In reviewing the denial of a motion to suppress, this court accepts as true the trial court's findings of fact unless they are clearly erroneous, but the ultimate determination of reasonableness is a question of law that is reviewed de novo. Wicks, 995 F.2d at 968-69.

Here, the district court found exigent circumstances based on two factors: (1) the danger to the public posed by the manufacturing of methamphetamine; and (2) the need to prevent destruction of the evidence. However, the government did not advance the need to prevent destruction of the evidence as an exigent circumstance and presented no evidence regarding that issue. Instead, the government only advanced the danger to the public as the reason for entry. Therefore, although the need to prevent destruction of the evidence might have given the officers a reason to enter, it was not the reason for entry in this case.

Did the government establish a danger to the public that would justify the warrantless entry? I would conclude it did not. In deciding the officers' public safety concerns provided an exigent circumstance sufficient to justify entry, the district court cited United States v. Brock, 667 F.2d 1311 (9th Cir. 1982). In Brock, agents surrounded a motor home at a state park, suspecting the

manufacture of methamphetamine. An agent smelled chemicals cooking, and another agent saw the defendant dash out of the motor home "gasping for air, as if choking on fumes." Id. at 1314. The agents entered the motor home and found an operating methamphetamine lab. The district court found exigent circumstances (the smell of methamphetamine, the defendant fleeing the motor home while choking on fumes, the officers' knowledge of the explosiveness of chemicals used in making methamphetamine, and uncertainty as to whether other occupants might still be in the motor home) supported entry for the safety of the occupants and to prevent an explosion. The Ninth Circuit affirmed the district court's findings and conclusions.

Brock is typical of cases which have upheld warrantless entry into a residence where methamphetamine manufacturing is suspected in order to protect the public. See United States v. Cervantes, 219 F.3d 882, 891 (9th Cir. 2000) (finding risk of explosion in apartment building constituted emergency justifying entry and there was no need for exigent circumstance analysis); United States v. Wilson, 865 F.2d 215, 216-17 (9th Cir. 1989) (finding exigent circumstances existed because of danger of explosion of methamphetamine lab in residential area); United States v. Echegoyen, 799 F. 2d 1271, 1278-79 (9th Cir. 1986) (finding danger of methamphetamine explosion in remote area with limited firefighting resources justified entry); United States v. Erb, 596 F.2d 412, 417-18

(10th Cir. 1979) (finding danger of methamphetamine manufacture combined with danger of destruction of evidence presented exigent circumstances). These cases rely in part upon the explosive nature of the manufacturing process. However, in the majority of these cases, there was some actual evidence of an existing danger to the public and that officers acted promptly in entering the residence to assess the danger and prevent harm. See Wilson, 865 F.2d at 216-17 (lab located in residential area and firefighters called to scene advised entry); Brock, 667 F.2d at 1318 (resident leaving house choking on fumes, combined with concern for other residents inside).

In the present case, the government's reliance upon public safety to support exigency is much less convincing. Although Officer Mallory contended entry was necessary to protect the "public," it is unclear whom he was seeking to protect. Mallory admitted that the residence was bounded on two sides by open mesa, on one side by an unoccupied garage, and on the other side by a trailer with its occupant known to be absent. Even if there was some evidence that the public would be endangered by an explosion, the officers' conduct belies the claim of exigency. Upon deciding a warrantless entry was necessary to protect the public, Mallory and the other officers did not immediately enter the residence, but rather searched for a key so they could enter without damaging the front door. Evidently, protection of the front door took precedence over protection of the

public. The entry itself was not effected until approximately thirty minutes after the decision to enter was made.

While warrantless entry into a residence where methamphetamine manufacturing is occurring has been upheld in other cases on public safety grounds, in this case the danger to the public was known to be minimal and the actions of the officers in attempting to find a key prior to entry belied any notion there was an emergency requiring immediate entry. By our concluding this entry was justified by exigent circumstances, we are effectively establishing a rule that a warrantless entry into a residence is always justified where methamphetamine is being manufactured. Or, stated another way, we are creating a methamphetamine lab exception to the warrant requirement.

The officers here had sufficient information and adequate opportunity to seek a search warrant prior to entering the residence. Officer Mallory had checked Rhiger's criminal record after the purchase of the 500 grams of iodine, but before the purchase of 500 grams of red phosphorous, and learned that Rhiger had been or was associated with the manufacture of methamphetamine. This information, along with the smell of methamphetamine and the earlier purchase of chemicals and related supplies, provided the officers with sufficient information to seek a warrant. The officers had surrounded the residence and there was no indication they feared the residents might try to escape. They were not concerned

-5-

that evidence might be destroyed -- in fact, it appears that more evidence was being manufactured. It was the middle of the day so obtaining a warrant would not be as difficult as a late-night request.

The government argues that even if the entry was unlawful, the evidence need not be suppressed. According to the government, the evidence was obtained pursuant to a valid search warrant, although the warrant was issued after the initial entry. "Although a search may violate the Fourth Amendment, the exclusionary rule is inapplicable if the evidence inevitably would have been discovered by lawful means." United States v. Souza, 223 F.3d 1197, 1202 (10th Cir. 2000). However, the inevitable discovery exception does not apply to all situations where police have probable cause for a warrant and fail to get one. Rather, the question is the likelihood that a warrant would have been issued and the evidence would have been found independent of the search. Id. at 1204. In determining whether a warrant would have been issued independent of the search, the following factors are helpful: (1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; (2) the strength of the showing of probable cause at the time the search occurred; (3) whether a warrant was ultimately obtained, albeit after the illegal entry; and (4) evidence that law enforcement lacked confidence in their showing of probable cause and wanted to force the issue. Id.

In this case, the search warrant was not issued independently of entry into the residence. Rather, the affidavit in support of the application for the search warrant was based in part on information obtained as a result of the warrantless entry. The inevitable discovery doctrine should not apply if the "agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." Murray v. United States, 487 U.S. 533, 542 (1988).